IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT W. KEATS, TRUSTEE,<br>P.O. Box 221377<br>Louisville, KY 40252<br><br>             Plaintiff,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF<br>EDUCATION; and LINDA M. MCMAHON,<br>in her official capacity as Secretary of<br>Education,<br>400 Maryland Avenue SW.<br>Washington, D.C. 20202<br><br>             Defendants. | CV No. _____<br><br><br><br>**COMPLAINT** |

Robert W. Keats ("Trustee" or "Plaintiff"), in his capacity as Trustee in Bankruptcy for the Estate of Decker, Inc. d/b/a Decker College, Inc. ("Decker" or "Debtor"), *see In re Decker College, Inc.*, No. 05-61805-jal (Bankr. W.D. Ky.), by and through his undersigned counsel, alleges as follows:

## **NATURE OF THE ACTION**

1.      Decker was once a pioneer in the field of vocational online education. Decker played by the rules when it obtained state licensure, accreditation and U.S. Department of Education ("Department") approval to enroll thousands of recipients of federal financial aid authorized by Title IV of the Higher Education Act of 1965, as amended ("Title IV") in certificate and degree programs preparing students for the construction industry. And it played by the rules when it requested reimbursement for those Title IV recipients as directed by the Department in July 2005, August 2005, and September 2005 while still an open institution.

2.    In response to Decker's requests for reimbursement, Department employee Ralph LoBosco threw out the rulebook because of his grudge against Decker's then-president, William F. "Bill" Weld. LoBosco forced Decker's accreditor, the Council for Occupational Education ("COE"), to disclaim its previously issued accreditation approval for Decker to offer the construction trade programs. By threatening COE's own certification, the Department coerced COE into claiming that it had never permitted Decker to offer online education despite the fact that Decker had properly submitted requests for approval and followed all required protocols. COE's statements regarding Decker's lack of accreditation were false, and a bankruptcy court and district court confirmed they were inaccurate after extensive judicial proceedings. COE's false statements regarding Decker's accreditation were used by the Department as a basis to deny Decker funds it was owed under Title IV, terminate eligibility to receive future Title IV funds, and force Decker out of business and into bankruptcy in 2006. The Department ultimately denied the requests for reimbursement submitted in 2005 based on grounds and guidance that were subsequently overturned.

3.    Through this action, Decker seeks the very least of what it is owed by the Department: a fair and lawful administrative process when seeking reimbursement for Title IV funds that Decker paid out of its own pocket in its last year of operation. Yet, for 20 years, the Department has acted arbitrarily, capriciously, and contrary to law by offering every possible pretext to prevent Decker from obtaining the justice it is owed.

4.    First, the Department claimed in 2006 that Decker owed it $32 million. Decker spent ten years overturning that determination through multiple administrative proceedings before the very agency claiming the liability and an administrative law judge ("ALJ") and ultimately the Secretary of Education rejecting the assessment. During that time, the Department refused to

entertain Decker's Title IV reimbursement requests.

5.      Second, in 2017, the Department manufactured millions of dollars in new claims and continued to refuse to consider Decker's Title IV reimbursement requests. The bankruptcy court rejected the Department's attempt to bring new claims approximately eleven years after the filing of Decker's bankruptcy petition.

6.      Third, after more than a decade of wrangling, Decker in 2018 finally obtained the Department's agreement to consider its request for Title IV reimbursement based on 50 student files from 2005. This initial 50-file test review was submitted due to the Decker estate's finite resources and the need to obtain guidance from the Department regarding the guidelines and standards for any future submission to facilitate processing. The Department did not process this request. In May 2019, Decker submitted its formal request for $3.6 million without agency guidance due to the inactivity regarding the original 50-file submission the Department requested. The Department refused to process the request citing arbitrary and unlawful requirements. In October 2019, the Department reached its final position: it refused to render a determination on the merits as to Decker's request for reimbursement. Since that date, the Department has not budged and has continued to refuse to review Decker's submission and at no time since the college was forced to close has the Department provided reimbursement for even a single student.

7.      Enough is enough. The Trustee of the Decker estate now brings this action to obtain a determination that the Department violated the Administrative Procedure Act ("APA") by arbitrarily and capriciously denying Plaintiff's May 2019 request for in reimbursement under Title IV. In the alternative, Plaintiff seeks an order under the APA and Mandamus Act compelling the Department to perform action unlawfully withheld by rendering a final determination on Plaintiff's May 2019 request for reimbursement under Title IV.

## PARTIES

8.      Plaintiff is the duly appointed Chapter 7 trustee of the Decker estate. *See In re Decker College, Inc.*, No. 05-61805-jal, ECF No. 10 (Bankr. W.D. Ky. Nov. 4, 2005).

9.      Defendant United States Department of Education is a federal agency headquartered at 400 Maryland Ave SW, Washington D.C. that, among other things, is responsible for the administration of student financial aid programs under Title IV of the Higher Education Act, as amended, 20 U.S.C. § 1001, et seq. ("Title IV Programs" and "HEA").

10.     Defendant Linda M. McMahon is the Secretary and head of Defendant United States Department of Education. She is sued in her official capacity.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, including the APA and the HEA. The Court also has subject matter jurisdiction under the Mandamus Act, 28 U.S.C. § 1361.

12.     The Defendants have explicitly waived sovereign immunity under the APA. *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.").

13.     The Court has personal jurisdiction over the Defendants, and venue is proper in the District of Columbia under 28 U.S.C. 1391(e), which provides that a "civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States,

may, except as otherwise provided by law, be brought in any judicial district in which (A) a defendant in the action resides." The Department of Education is headquartered in this district.

## **BACKGROUND**

A.      **After a Decade of Successful Operation and Participation in the Title IV Programs, Decker Launches its Construction Program**

14.     Decker was founded in 1989 in Louisville, Kentucky, with the mission of providing educational programs and vocational training designed to meet specific business and industry goals as well as the personal career goals of students.

15.     After attaining institutional accreditation with the COE in 1992, Decker applied to the Department for eligibility and certification to participate in the Title IV Programs, which the Department granted later that year.

16.     For the next decade, Decker focused on offering certificate and associate's degree programs in business and technology, which it offered at its campus in Louisville.

17.     In 2002, recognizing the construction industry's need for skilled craftsmen, Decker began developing several associate degree programs in Electrical Science, Carpentry Science, and HVAC Science (collectively, the "Construction Programs"). Decker designed the Construction Programs to be offered through a "hybrid" delivery methodology, now widely accepted in higher education, in which part of the program was offered online and part at Decker's construction-focused instructional sites in Georgia, Florida, Indiana, and Kentucky. For the online components of the curriculum, internationally recognized distance education experts worked closely with Decker to develop online versions of the construction curricula created by the National Center for Construction Education and Research.

18.     In order for students enrolled in the Construction Programs to be eligible to receive federal student aid under the Title IV Programs, Decker worked extensively with state oversight

agencies and COE to secure approval of the programs. Beginning in 2002, Decker secured state approvals and engaged with COE to provide descriptions of the Construction Programs, including a face-to-face meeting with COE in September 2003 and a presentation to COE in March 2004. Finally, in April and May 2004, Decker submitted applications to COE for approval of the Construction Programs. The Executive Director of COE, Gary Puckett ("Puckett"), sent letters to Decker in June 2004 confirming that COE had extended accreditation to all three.

19.     Decker subsequently began enrolling students in the Construction Programs. A team of COE evaluators who visited Decker in August 2004 confirmed that it was offering the Construction Programs in a manner consistent with its approvals and with the self-study report it had submitted in advance of the visit, which disclosed the exact schedule and number of weeks of instruction that were provided online versus on-site.

20.     The Construction Programs proved to be in high demand. For the 2004-2005 federal student aid award year, Decker enrolled approximately 4,500 students in these and other programs, supported by hundreds of staff, faculty, and contractors. At that time, Decker's most recent federal cohort default rate – a commonly cited metric calculated by the Department that speaks to student ability to repay federal loans following graduation – was only 2.7%, compared to 8.0% among similar institutions nationwide for the same period.

21.     As evidenced by a Goldman Sachs report from June 2005, comparable valuations of similar private educational institutions placed Decker's enterprise value at an estimated $462 million by the end of 2005.

**B.     The Department Abruptly Suspends Title IV Program Funding to Decker**

22.     The Department's approval to administer Title IV Program funds is a matter of life or death for institutions of higher education, including Decker. Institutions process and distribute funding on behalf of students and rely on payments of tuition and fees to cover the cost of

instruction, facilities, faculty and staff salaries, student services, and the other functions required by accreditors and state regulators. In 2005, nearly all of Decker's students were eligible for some form of federal financial aid, which they relied on to finance their studies and related living expenses.

23.     In January 2005, William F. Weld ("Weld") was appointed as Decker's Chief Executive Officer. In the 1980s, Weld had served as the U.S. Attorney in Massachusetts, where he investigated and successfully prosecuted Wilfred American Educational Corporation ("Wilfred") for fraud in the operation of its institutions. Wilfred was forced to cease operations in 1994. Ralph LoBosco was a senior employee of Wilfred at the time of its closure.

24.     As described in a 2005 declaration submitted by a former Decker employee regarding Decker's suit against COE, LoBosco told this employee that the change in position caused by Wilfred's closure significantly affected his and his wife's lifestyle. *Compass Educ. Holdings, Inc. v. Council on Occupational Educ., Inc.*, No. 1:05-cv-02645-JTC, (N.D. Ga. Oct. 13, 2005), ECF No. 5-4.

25.     Following the closure of Wilfred, LoBosco became employed by the Department's Office of Federal Student Aid ("FSA"), eventually becoming the Area Case Director responsible for leading the Kansas City regional office. In this role he oversaw institutional compliance with Title IV Programs in several states. The Kansas City office led by LoBosco was responsible for overseeing compliance for schools in Kentucky, including Decker.

26.     In the first week of June 2005, the FSA Kansas City Case Team headed by LoBosco initiated a discretionary, unannounced, on-site program review at Decker's main campus in Louisville.

27.     Following the team visit, LoBosco sent a letter to Weld on June 14, 2005, notifying

him that, effective the previous day and as a result of FSA's program review, the Department had changed the method by which Decker could access Title IV Program funding to Heightened Cash Monitoring 2 ("HCM2"). Under the HCM2 payment method, an institution must disburse its own funds to students' accounts before receiving Title IV Program funds, and then provide the Department with student records for which it seeks reimbursement. As described in the HCM2 instructions, the Department generally reviews a sample of up to 100 students from each submission and approves reimbursement based on that sample. Neither the imposition of HCM2 nor the Department's refusal to pay is subject to appeal under agency rules, and no mechanism exists to challenge those decisions.

28.     The change in Decker's method of Title IV Program payment immediately suspended the flow of funds it needed to satisfy tuition payments from its students and pay faculty, leases for instructional sites, student services staff, and all other expenses associated with offering educational programs. Instead of being able to draw down Title IV Program funds, Decker was required to advance its own funds to students to satisfy educational and living expenses that students were eligible to receive under the Title IV Programs before seeking reimbursement from the Department for those payments. The Department assured Decker that it could apply for reimbursement of the Title IV Program funds after filing requests for repayment.

29.     Decker submitted its first reimbursement request in July 2005. FSA rejected it for reasons that Decker later proved – in the Department's own administrative tribunal – were based on improper interpretations and applications of relevant regulations by Department staff. Specifically, FSA Institutional Program Reviewers directed Decker to revise and resubmit the substantial request, asserting that Decker had incorrectly calculated Pell Grants and unearned Title IV Program funds for students who had withdrawn. At the time, because Decker was in a position

of extreme financial exigency and had no avenue of appealing the imposition of HCM2, it agreed to follow FSA's recalculation instructions and reduce reimbursement amounts in an effort to keep the school open for students to complete their programs.

30.    Decker prepared two new reimbursement requests following FSA's since overruled guidance, which it submitted on August 10, 2005, and September 8, 2005. These two requests totaled approximately $11.5 million and were accompanied by eighteen boxes of supporting documentation.

### C.    The Department Falsely Alleges that Decker is Not Accredited

31.    Throughout September 2005, Decker continued to correspond with FSA regarding the pending reimbursement requests. Weld and others at Decker received repeated confirmations from the Department's reimbursement specialists that the claims were correctly calculated and that Decker could begin disbursements as soon as senior-level approvals in the chain of command were granted. But those senior-level approvals never came, and financial challenges became critical as the Department refused to repay Decker for funds it had properly advanced.

32.    On September 30, 2005, Weld received a letter from FSA denying Decker's continued certification to participate in the Title IV Programs. The letter alleged that COE had not accredited the Construction Programs, stating, "Decker violated Title IV, HEA program requirements when it awarded Title IV, HEA program funds for students in the AAS [Construction] programs, and therefore the Department must deny Decker's recertification application." This determination came as a surprise to Decker. Decker had no opportunity prior to the Department issuing the denial to respond to COE's claim that the Construction Programs were not accredited.

33.    Like the HCM2 action, the denial of recertification was not subject to any formal appeal process with the Department, before an ALJ, or any other independent designated official

to stay the decision or review the rationale.

34.     Decker later learned through litigation and Freedom of Information Act requests that, around June 2005, LoBosco had begun to make repeated inquiries to, and requests of, COE regarding Decker, its accreditation status, and the extent of the online portion of the Construction Programs. COE is a non-governmental organization that relies on dues paid by member institutions to retain their accreditation. This accreditation renders COE members eligible to receive Title IV Program funds on behalf of enrolled students as long as COE retains recognition by the Department, which it must periodically renew. Unbeknownst to Decker, LoBosco frequently corresponded with COE Executive Director Puckett about Decker, emailing him news articles regarding Weld.

35.     LoBosco simultaneously contacted Department colleague John Barth ("Barth"), Director of the Department's Accreditation and State Liaison Office, the division of the Department responsible for overseeing the actions of accreditors recognized by the agency, regarding COE's authority to accredit online programs under its recognition by the Department. At the time of these contacts, COE had recently filed its own Petition for Continued Recognition by the Department as a nationally recognized agency under 20 U.S.C. § 1099b, which included a request to expand the scope of COE's recognition by the Department. Barth's office was responsible for reviewing COE's request for continued recognition as a "gatekeeper", and for recommending a course of action to the Secretary.

36.     Continued recognition was key to COE's operations and ongoing access to Title IV Program funds for the hundreds of colleges COE accredited. Among those were colleges that relied on the distance education delivery methodology used by Decker. If COE lost recognition by the Department, all schools would have been required to apply for accreditation by another recognized

accrediting agency or risk losing access to Title IV Program funds for thousands of enrolled students. COE was entirely dependent on a combination of membership and user fees from currently accredited and prospective member institutions.

37.    LoBosco made sure to inform COE that he had contacted Barth. Puckett then sent an apparently unsolicited letter to the Department staff member responsible for reviewing COE's application for continued recognition. In the letter, Puckett claimed that COE had not approved the Construction Programs to be offered via distance education, explained that LoBosco had notified him regarding his "concerns" about Decker, and stated that, based on LoBosco's report, COE was taking steps to ensure that Decker corrected its "violations." Despite the Department's repeated discussions regarding COE's accreditation of Decker, neither COE nor the Department contacted Decker about the issue until much later in the process.

38.    In a subsequent case filed against the COE, two different tribunals found COE's statements regarding Decker to be false and factually erroneous. *Keats v. Council on Occupational Educ., Inc. (In re Decker College, Inc.)*, Ch. 7 Case No. 05-61805, Adv. No. 09-3091, 2012 WL 6136708, at *12 (Bankr. W.D. Ky. July 10, 2012); *Keats v. Council on Occupational Educ., Inc.*, No. 3:12-MC-00018-H, 2012 WL 6084646, at *6 (W.D. Ky. Dec. 6, 2012).

**D.    The FBI Seizes Decker's Records and Forces It to Close.**

39.    On October 21, 2005, the Federal Bureau of Investigation ("FBI") seized Decker's physical and electronic records in connection with an investigation conducted jointly with the Department's Office of Inspector General ("OIG"). No criminal indictments or convictions, civil liabilities, or other findings of wrongdoing ever emerged from this investigation. This seizure was unannounced, and Decker never learned the reasons for it. The FBI did not return the seized records until 2009.

40.    Without the records necessary to continue processing Title IV Program funding and

respond to the Department's inquiries, Decker closed its doors that same day and did not reopen.

41.     On October 24, 2005, creditors filed an involuntary bankruptcy petition in the Court, forcing Decker into bankruptcy. The bar date for filing proofs of claim in the Bankruptcy case was set for April 10, 2006 (the "Bar Date").

42.     Robert W. Keats was appointed as Trustee on November 4, 2005.

**E.     The Department Imposes a $32 Million Liability Based on Findings Later Shown to be Improper**

43.     On March 31, 2006, the Department issued a Final Program Review Determination ("FPRD"), the final statement of findings and proposed liabilities stemming from the program review that FSA initiated in June 2005. FSA typically issues a preliminary program review report and allows the institution a chance to respond before liabilities are assessed, but no such opportunity was provided to Decker prior to the denial of recertification. The FPRD is attached hereto as **Exhibit A**.

44.     In the FPRD, the Department asserted total liability in the amount of $32,109,646, $31,595,885 of which was based on a finding (Finding 1) that Title IV Program funds awarded to students enrolled in the Construction Programs were improper because those programs had not been accredited by COE to be offered in a distance education format.

45.     Finding 2 alleged that Decker miscalculated the amount of Title IV funds that should have been returned to the Department due to student withdrawals.

46.     In Findings 3, 4, and 5, the Department asserted that Decker's programs were considered "non-term," and therefore, Decker had allegedly disbursed loan and grant funds to students who did not qualify based on the relevant regulatory parameters for non-term programs. Exhibit A at 10–13

47.     Finding 6 – which did not carry any liability or rest on any independent basis, but

was based entirely on the preceding findings – claimed that Findings 1 through 5 "indicate[d] that Decker lacked the administrative capability to administer the Title IV, HEA programs properly." Exhibit A at 14.

**F.    The Department Denies Decker's Pending HCM2 Reimbursement Requests**

48.    On the same day that the Department issued the FPRD, the Department also sent Decker a letter denying its outstanding HCM2 reimbursement requests. The Department identified the primary reason for the disallowance as the alleged ineligibility of Decker's Construction Programs due to their lack of COE accreditation. The other two cited reasons for denial were Decker's alleged liabilities outlined in the FPRD and Decker's failure to submit a close-out audit, which could not be submitted because the FBI and the Department's OIG had confiscated nearly all of Decker's physical and electronic records five months earlier in October 2005. At the time of the reimbursement denial, the FBI had not returned Decker's records. They were not returned until years later in 2009 in a state of disarray and damaged by the retention.

**G.    The Department Files a Proof of Claim Based Solely on the FPRD and Draws on Decker's Letters of Credit**

49.    Likely believing that findings against a closed institution would not be challenged, the Department filed an unsecured proof of claim with the Bankruptcy Court a few days prior to the April 10, 2006, bar date. See Claim No. 557-1 (the "POC"). This POC was based solely on the liabilities asserted in the first five FPRD findings and did not include any potential interest claims or other contingent or unliquidated liabilities. The POC is attached hereto as **Exhibit B**.

50.    On April 10, 2006, the Department drew on letters of credit Decker had posted in connection with routine financial reviews, claiming they were for refunds, closed school discharges, and other liabilities, without providing any accounting for these funds. The Department still has not returned those funds or provided any accounting for the use of the proceeds.

**H.     Decker's Lengthy Battles to Reverse the Department's FPRD Findings**

51.     Upon receiving the FPRD, Decker promptly filed a request for review in an administrative proceeding under Subpart H of Title 34, Part 668, of the Code of Federal Regulations. In Subpart H proceedings, an administrative law judge ("ALJ") or other designated official in the Department's Office of Hearings and Appeals ("OHA") is responsible for reviewing written submissions from the institution and FSA, hearing oral arguments, and issuing a decision regarding whether the FPRD is supportable, in whole or in part. None of the other actions taken by the Department, including the imposition of HCM2 and the denial of recertification, were eligible for adjudication by an OHA ALJ or by OHA.

52.     In accordance with the OHA briefing schedule, Decker filed briefs and documentation in 2007 and 2008 supporting its position that the Construction Programs were accredited by COE, leaving no basis for Finding 1, and arguing that the remaining findings were invalid because the Department's interpretations of its regulations were incorrect as applied to Decker's programs.

53.     Regarding Finding 1, FSA argued in response that only COE or a court could change COE's letter to the Department asserting that it had not accredited Decker's Construction Programs.

54.     Because of FSA's insistence, Decker initiated a judicial proceeding to determine whether COE's statements to the Department were false, filing suit against COE in an adversary proceeding within its Chapter 7 bankruptcy proceedings on December 15, 2009. The ALJ stayed the administrative proceeding until Decker could obtain a finding of fact in an adversary proceeding against COE.

55.     In March 2012, the bankruptcy court conducted a four-day evidentiary hearing. Following that hearing, it held that COE's statements to the Department were "false" and

"factually erroneous." *Keats v. Council on Occupational Educ., Inc. (In re Decker College, Inc.)*, Ch. 7 Case No. 05-61805, Adv. No. 09-3091, 2012 WL 6136708, at *12 (Bankr. W.D. Ky. July 10, 2012)

56.     COE appealed these Findings of Fact to the U.S. District Court in August 2012. Following a de novo review, the District Court affirmed the bankruptcy court's decision and stated, "[t]he Bankruptcy Court reasonably found COE to be dishonest when it told the Department it did not approve the Hybrid Programs to be offered in this manner." *Keats v. Council on Occupational Educ., Inc.*, No. 3:12-MC-00018-H, 2012 WL 6084646, at *6 (W.D. Ky. Dec. 6, 2012).

57.     In January 2013, COE then appealed to the Sixth Circuit, which dismissed the appeal for lack of subject matter jurisdiction later that year, allowing the District Court's ruling to stand. *Council on Occupational Educ., Inc. v. Keats (In re Decker College, Inc.)*, 578 F. App'x 579, 582 (6th Cir. 2014). Decker ultimately reached a monetary settlement with COE regarding its false claims that it had not accredited Decker's programs.

58.     Following the Sixth's Circuit's dismissal of COE's appeal, Decker turned its attention back to the Department administrative proceeding, five years after it had been paused due to FSA's insistence that a judicial tribunal needed to resolve the foundational question of whether COE's statements to the Department were false. This insistence to seek further litigation following the Bankruptcy, District, and Circuit decisions led to the further delay of Decker's ability to pursue its claims against the Department.

### I.     The ALJ and Secretary Agree with Decker and Eliminate Nearly All Decker's Liability

59.     Despite the effort and expense Decker had undertaken over the course of five years to satisfy FSA's request to resolve the validity of COE's denial of accreditation, FSA yet again attempted to block the administrative proceeding from resuming. The ALJ rejected FSA's attempt

and, after another round of briefings, issued a decision in March 2016 – nearly 10 years after the Department issued the FPRD – rejecting nearly the entire $32 million liability the Department had assessed against Decker. *Decker College, U.S. Dep't of Educ.*, No. 06-22-SP (Mar. 15, 2016) (as later affirmed, the "ALJ Decision"). The ALJ Decision is attached hereto as **Exhibit C**.

60.    First, the ALJ determined that "the statements made in COE's letter to FSA were false, and that COE had accredited Decker for its program, including the distance education components." Exhibit C at 7. He also criticized FSA's attempt to further delay Decker's case, noting that "[t]here is a point at which a delay in the hearing process becomes a constitutional violation of Decker's right to procedural due process." *Id.* This conclusion eliminated the $31,595,885 liability that FSA had asserted against Decker for Finding 1 in the FPRD.

61.    For Finding 2, the ALJ held that FSA improperly alleged that Decker's methodology for determining the withdrawal dates of students it used in calculations for refunds to the Title IV Programs "inflated" the amount Decker could retain. Specifically, the ALJ determined that, under relevant regulatory language, FSA was incorrect that the withdrawal date had to be based on the student's initiation of contact with Decker rather than Decker's initiation of contact with the student. For Findings 3, 4, and 5, the ALJ rejected FSA's claims that Decker made disbursements of loan and grant funds to students before it was authorized and miscalculated the appropriate disbursement of Pell Grant funds. The ALJ sided with Decker's interpretations of the Department's regulations in every instance and only upheld a portion of liability under Findings 3 and 4, which was a liability Decker had already conceded.

62.    Finding 5 liability was eliminated as well, and the ALJ reprimanded FSA for its attempt to go beyond the language of the regulations with respect to their application to Decker, stating, "[a]s an Administrative Judge, I cannot waive, ignore or invalidate the applicable

-16-

regulations. . . . The regulations are clear and I must follow them." Exhibit C at 13.

63.    FSA appealed the ALJ's decision with respect to Findings 1 and 2 to the Secretary of the Department (the most senior agency official), who in November 2016 also rejected every one of FSA's arguments and affirmed the ALJ's decision on all fronts. Decker College, U.S. Dep't of Educ., No. 06-22-SP (Nov. 2, 2016). The Secretary's decision is attached hereto as **Exhibit D**.

64.    The Secretary repeatedly emphasized that he was "unpersuaded" by FSA and confirmed that the ALJ properly concluded that Finding 1 was "factually unsupported," while Finding 2 was unsupported by the Department's regulations. Exhibit D at 4–8.

65.    Accordingly, a decade after the FPRD was issued, the ALJ and Secretary confirmed that Decker was correct and eliminated nearly all of the Title IV liability, the rationale for denying Decker's continued authorization to receive Title IV funds, and rejecting requests for reimbursement. However, because the Department's administrative appeal process only adjudicates Title IV funds due *to the Department*, it did not resolve the amounts due *to Decker* or the process by which Decker could seek payment of the long overdue HCM2 requests.

**J.    After Losing in Its Own Administrative Proceedings, the Department's Unsuccessful Attempt to Introduce New Liabilities**

66.    Because the Department's POC in Decker's bankruptcy was based solely on the FPRD liabilities, which were almost entirely overturned in the administrative proceeding, the Department improperly attempted to add new claims to an amended POC in early 2017 despite that the sole purpose of the amendment should have been to reduce the original liability amount, as specifically directed by the ALJ and affirmed by the Secretary.

67.    These new claims included approximately $6.7 million purportedly arising from the Department's discharge of student loans made to Decker's students after the agency unilaterally chose to forgive the obligations and forced Decker to close. The Department also

included a new claim for interest in connection with the FPRD liabilities.

68.     The bankruptcy court rejected the Department's attempt to "assert any claims that were not originally and expressly asserted in the FPRD." While permitting the Department to amend its proof of claim to reflect recalculation of liabilities expressly asserted in the FPRD, as ordered by the Secretary, the bankruptcy court held that the Department's actions were "manifestly unjust." Order Denying Motion to Amend Proof of Claim in Part and Granting it in Part at 1-2, *In re Decker College, Inc.*, No. 05-61805 (Bankr. W.D. Ky. Mar. 31, 2017), ECF No. 599 at 2.

### K.     The Department Refuses to Pay Decker's Application for Reimbursement

69.     Following Decker's successes in litigating against COE and prevailing in judicial and administrative proceedings against FSA over the course of a decade, the Trustee was finally able to begin the process of reassembling certain previously seized paper files and preparing reimbursement requests aligned with the ALJ's and Secretary's decisions.

70.     Toward this end, in fall 2017, Decker hired a vendor to begin scanning the 900+ boxes of records that the FBI had seized in 2005 and returned in 2009 to a storage locker located on the outskirts of Louisville in various states of disarray. In spring 2018, Decker hired an experienced accounting firm that specializes in Title IV and regularly prepares HCM2 requests, Weworski & Associates ("Weworski"), to prepare student files in support of a reimbursement request to the Department.

71.     On behalf of Decker, Weworski submitted a batch of fifty student records for the Department to review in advance of a formal request for reimbursement, because preparation of a comprehensive submission for all outstanding amounts was cost-prohibitive for Decker, and there is no requirement that an institution submit all requests for reimbursement at the same time. The Department offered to review these files to help guide the subsequent submissions. These fifty files were submitted to the Department via the U.S. Department of Justice ("DOJ") on December

18, 2018. On May 29, 2019, due to the delay in the review of the original 50 files, Weworski submitted another set of files on Decker's behalf. This submission was in accordance with the Department's directions in its June 2005 HCM2 letter and the subsequent ALJ and Secretary decisions and was accompanied by a formal request for reimbursement of approximately $3.6 million.

72.    The Department acknowledged receipt of this formal submission by letter on June 19, 2019. *See* **Exhibit E**. At that time, the Department indicated that it would not process the formal submission unless Decker complied with extensive and unreasonable requests for additional information that are not required by statute or regulation. The Department finalized its position in a subsequent letter dated October 7, 2019. *See* **Exhibit F**. That letter confirmed that the Department would not process Decker's formal request for reimbursement until it provided information that is not required by law, and which has no bearing on Decker's entitlement to payment. The Department's requests for information are pretextual. They have no legitimate basis in statute or regulation and are calculated to drain the estate's finite resources and prevent the estate from obtaining funds to which it is lawfully entitled.

73.    The Department's pretextual demands for more information were, among other deficiencies, based on regulations that did not exist at the time Decker was in operation and on incorrect interpretations of applicable requirements. For instance, the Department demanded that Decker show how its award of academic credit in 2004 and 2005 aligned with current regulatory definitions of a credit hour, despite the fact that no credit hour rules or similar federal requirements related to measurement of academic activity existed at the time Decker was offering the Construction Programs and were not introduced until 2010.

74.    Since that time, the Department has not made any payment to Decker pursuant to

Decker's request for reimbursement and—on information and belief—has not begun to process Decker's formal request. Normal processing time for typically much larger reimbursement requests is approximately thirty days, as the Department acknowledged in its June 19, 2019 letter. Nevertheless, more than six years after Decker's formal request for $3.6 million, and 20 years after Decker's first application for reimbursement in 2005, the Department has not remitted any funds to Decker.

75.     The Department's two-decade runaround has frustrated the bankruptcy court's efforts to liquidate Decker's assets for the benefit of its creditors. The Trustee thus brings this action pursuant to the APA to obtain a ruling that the Department has arbitrarily and capriciously rejected Plaintiff's May 2019 50-file submission seeking reimbursement under Title IV. In the alternative, the Trustee seeks a court order under the APA and Mandamus Act requiring the Department to conduct a lawful review of its 50-file submission and issue a final determination.

## COUNT I

### (Administrative Procedure Act (5 U.S.C. § 706(2))

76.     Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.

77.     The APA empowers the Court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" "contrary to constitutional right[,]" or "in excess of statutory . . . authority . . . or short of statutory right." 5 U.S.C. § 706(2).

78.     In May 2019, Decker formally submitted 50 complete and proper Title IV claims to the Department for reimbursement, along with the accompanying set of student files.

79.     By letter on October 7, 2019, the Department communicated its final decision to condition the processing of those claims on certain unreasonable and pretextual demands for

further information. These demands for further information have no basis in law or regulation and violate Decker's right to an administrative review and decisionmaking process that is not arbitrary and capricious.

80.    The Department's decision to condition its review on these demands constitutes final agency action within the meaning of the APA. It was, and remains, the agency's final word on the matter and has immediate legal consequences for Decker because Decker cannot obtain Title IV reimbursement unless it complies with the Department's unreasonable demands.

81.    The Court should hold the Department's decision to impose unreasonable conditions on its review of Decker's formal submission for reimbursement to be unlawful and enjoin the Department from acting (or refusing to act) on the basis of that decision.

## COUNT II

### (Administrative Procedure Act (5 U.S.C. § 706(1))

82.    Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.

83.    The APA empowers the Court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

84.    In May 2019, Decker formally submitted 50 complete and proper Title IV claims to the Department for reimbursement, along with the accompanying set of student files.

85.    The usual processing time for such requests is 30 days. Six years later, the Department has still not processed this request for reimbursement or paid the requested funds.

86.    Processing this request is a discrete action that the Department is required to take under Title IV and its implementing regulations. *See* 20 U.S.C. § 1070 et seq. To date, the Department has unlawfully refused to process those claims.

87.    The Court should order the Department to process Decker's May 2019 request for

reimbursement under Title IV and issue a final determination.

## COUNT III

### (Mandamus Act 28 U.S.C. § 1361)

88.     Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.

89.     The Mandamus Act, 28 U.S.C. § 1361, gives this Court jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed." Further, (1) Plaintiff has a clear and indisputable right to relief under Title IV, (2) the Department is violating a clear duty to act under Title IV, and (3) no adequate alternative remedy exists to compel the Department to comply with its obligations under Title IV.

90.     The All Writs Act, 28 U.S.C. § 1651, empowers this Court to issue all writs "necessary or appropriate" in aid of its jurisdiction.

91.     In May 2019, Decker formally submitted 50 complete and proper Title IV claims to the Department for reimbursement, along with the accompanying set of student files.

92.     Processing this request is a discrete action that the Department is required to take under Title IV and its implementing regulations. *See* 20 U.S.C. § 1070 et seq. To date, the Department has unlawfully refused to process those claims.

93.     The usual processing time for such requests is 30 days. Yet after nearly six years, the Department has still not processed this request for reimbursement or paid the requested funds. Indeed, Defendants have affirmatively refused to process these claims. This delay is unreasonable, prejudicial to Decker's creditors, and calculated to prevent Plaintiff from obtaining the relief he is entitled to pursue under Title IV.

94.     Plaintiff is entitled to a writ of mandamus pursuant to 28 U.S.C. §§ 1361 and 1651 and under this Court's equitable authority to compel Defendants to process Decker's claims for reimbursement and issue a final determination.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

1)     An order vacating the Department's unlawful action and directing the Department to process Plaintiff's May 2019 request in accordance with Title IV under Count I;

2)     An order requiring the Department to take appropriate action to process Plaintiff's May 2019 request in accordance with Title IV under Count II;

3)     An order requiring the Department to take appropriate action to process Plaintiff's May 2019 request in accordance with Title IV under Count III; and

4)     Such other and further relief as the Court deems just and equitable.

WHEREFORE, Plaintiff prays that the Court enter judgment in favor of Plaintiff, and against Defendants, and award Plaintiff all requested relief.

*[Remainder of Page Left Intentionally Blank]*

Dated: Washington, D.C.
      October 6, 2025

Respectfully Submitted,

**Cooley LLP**

*/s/ Carlton E. Forbes*
Carlton E. Forbes
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
Tel.: (202) 842-7800
Fax: (202) 842-7899
cforbes@cooley.com

Matthew Kutcher (*pro hac vice* forthcoming)
Kevin Carlson (*pro hac vice* forthcoming)
James Callahan (*pro hac vice* forthcoming)
Patrick Northrup (*pro hac vice* forthcoming)
110 N. Wacker Drive, Suite 4200
Chicago, IL 60606
Telephone: (312) 881-6500
Email: mkutcher@cooley.com
        ktcarlson@cooley.com
        jcallahan@cooley.com
        pnorthrup@cooley.com

Matthew Oliver (*pro hac vice* forthcoming)
500 Boylston Street, 14th Floor
Boston, MA 02116
Telephone: (617) 937-2300
Email: moliver@cooley.com

*Counsel for the Plaintiff*