# EXHIBIT E



**U.S. Department of Justice**

*United States Attorney*
*Western District of Kentucky*

RMC/jrcm        717 West Broadway        Phone: 502-582-5911
       Louisville, KY 40202        Fax: 502-582-5097
       Website: www.justice.gov/usao/kyw

June 19, 2019

***VIA EMAIL ONLY***

Jay Vaughn
11951 Freedom Drive
Reston, VA 20190-5656

Robert W. Keats
P.O. Box 221377
Louisville, KY 40252-1377

Dear Jay:

We received your correspondence dated May 29, 2019. As a preliminary matter, the United States will once more clarify that the fifty-file review is a "test review" offered to provide guidance to the Trustee and his accountant regarding the HCM2 process. The United States has made this clear in open court on repeated occasions and even began expressing this in writing over eight months ago.

**I.**      **The United States is conducting a test review of 50 student files, in order to provide guidance to the Trustee and his accountant regarding the HCM2 process.**

On October 17, 2018, the United States sent a letter to your office addressing the list of 50 students initially identified by the Trustee. *See Attached Exhibit A.* The United States explicitly indicated in that letter that "FSA cannot limit its review to the 50 students identified by the Trustee" as the Trustee did not comply with FSA's August 8, 2018 instructions for HCM2 review. *Id.* Importantly, the Trustee's list of 50 students did not allow FSA to identify a statistically random sample of student files to review, in compliance with FSA's procedures (outlined in §§ C & D of the United States August 8, 2018 instructions, *see Attached Exh. B*). *Id.*

Thereafter, at a hearing on or around October 24, 2018, the United States explained to the Court that FSA could not conduct an HCM2 review of 50 student files cherry-picked by the Trustee. At the Court's suggestion, the United States, however, agreed to conduct a test review of the fifty student files to provide feedback and guidance to the Trustee, in an attempt to save the estate's scarce and limited resources.

After the October hearing, on November 6, 2018, the United States submitted a Stipulation to the Trustee and your office by email which outlined "the next steps in Decker's HCM2 review as ordered by Judge Fulton and agreed to by the parties." *See Attached Exhs. C & D.* The

correspondence made clear that, "this is a test review of the documents." *See Email, attached as Exh. C.* Likewise, the proposed stipulation explicitly stated that "[t]o provide guidance to the Trustee and his accountant regarding the HCM2 review process, the Department will conduct a **test review** of fifty student files submitted by the Trustee." *See Stipulation*, attached as *Exh. D* (emphasis added). Next, the proposed stipulation stated that "**[a]fter** this test review is complete, the Trustee will make a reimbursement request in accordance with the directions provided by the Department on August 8, 2018." *Id.* (emphasis added).

Despite the United States' attempt to clarify the fifty-file review process, the Trustee failed to respond to the United States' proposed stipulation, and no stipulation was filed with the Court. *See General Docket No.* 05-61805.

Nevertheless, at the insistence of the Trustee and other creditors, the United States arranged for new analysts in Washington, D.C. to conduct a "50-file HCM2 **feedback review**." *Exh. D* (emphasis added). As this was a preliminary review, "the Department [did] not require the Trustee to submit all the supporting documentation with the HCM2 files, including Form 270 and the Excel spreadsheet containing the required student information." *See Exh. A.* The United States, however, explicitly "reserve[d] the right to require the Trustee to submit the spreadsheet and other information as needed to review the 50 files and provide feedback." *Id.* Further, without having seen the information, the United States explained that the 50-file review "may take 6-8 weeks to complete." *Id.* The United States warned, however, that the schedule could vary. *Id.* Finally, the United States explained that it was "optimistic that the **feedback review** [could] provide the Trustee with more information about the state of Decker's documentation and potentially allow the Trustee and the accounting firm to identify and remove any problematic files from Decker's larger, **formal** HCM2 submission." *Id.* (emphasis added).

The Trustee and your office never responded to the communication, nor explained that it disagreed with the characterization of the review or timelines expressed therein. Despite receiving our instruction letter in August 2018 and multiple correspondence in 2018 about the 50-file feedback review, we could not access the fifty files to start the feedback review until January 30, 2019. In fact, our office emailed you on January 9, 2019—during the government shutdown—seeking additional assistance on the password issue so that we could access the Trustee's information once the shutdown ended.

In any event, the Department's initial review of these 50 files was completed on May 19, 2019. Accordingly, the Department prepared a detailed letter explaining, *inter alia*, issues and concerns it has with the submission. That letter also provided a list of documentation needed by the Department to proceed with the review. *See Doc. 849-1.*

Your office responded, on May 29, 2019, providing information purporting to answer some of the Department's questions and submitting some of the requested documentation. *See Attached Exh. E.* You, however, failed to provide documentation establishing: (1) the method by which the institution determined that a student completed an amount of academic activity that reasonably approximates an hour of classroom or direct faculty instruction and two hours of outside classroom for each credit attempted; and (2) an explanation of how students were able to complete the amount of academic activity to earn large numbers of credits in compressed timeframes." *Id.* at 11. While not explicitly stated, you also failed to provide requested documentation showing that Decker students successfully completed the program, and you failed to provide documentation

establishing that FFEL Program loans identified on the Weworski ledger card were disbursed and delivered to students. *See id.*

Despite having an incomplete response to the Department's request, the United States continues to review the estate's submission and appreciates the response and documentation you provided. We will follow up with you if the Department has additional questions or needs additional information related to these new documents. The Department, however, cannot complete this review until the Trustee provides the information requested and answers all questions posed by the Department. Please let us know when this documentation and information can be provided. Or if the documentation does not exist, please let us know.

## II.    The United States is not reviewing the deficient "formal HCM2 submission" from the estate.

Along with providing a response to the Department's fifty-file review, your office also attempted to submit a formal HCM2 submission on May 29, 2019. *See Attached Exh E.* Therein, the Trustee purported to "clarify that the latest request for payment that accompanies this submission is not advisory and include the original 50 files that prompted this feedback," and you requested feedback "within the next 30 days, per ED's explicit policy." *Id.* at 12. As explained more fully below, the United States is not reviewing this request; it is deficient.

Notably, this review process began in the summer of 2018 when our office first sent the Trustee specific instructions about how to submit a request to the Department and the information required with the submission. In our August 8, 2018 instructions, we explained that particular student documentation was required to accompany or supplement a reimbursement request. *Inter alia,* this included broad definitions of documents, such as "additional relevant student file documents" and "[i]nformation describing characteristics for each academic program to determine program type . . . and method of delivery." *Exh. B* at 9, 10-11. Likewise, the 2004-2005 and 2005-2006 Federal Student Aid Handbooks specifically acknowledge the Department may modify the HCM2 and reimbursement process and may "tailor the documentation requirements for schools operating under HCM on a case-by-case basis." 2004-2005 Federal Student Aid Handbook, vol. 4, pg. 38.

As described above, the Department requested additional information related to fifty of the files included in this "formal HCM2 submission." Yet the Trustee failed to provide all requested information in response to the United States' May 19, 2019 Letter, (*Doc 849-1*). Until the Trustee provides a complete response to the United States this May 29, 2019 "formal HCM2 submission" is deficient.

## III.    The United States cannot treat this review as a "standard HCM2 submission" from an operating institution; Decker college is closed.

True, when an institution is open and continues to provide educational programming, HCM2 reimbursement requests are typically processed within thirty days. In those situations, however, any payments made to the institution under HCM2 are subject to audits, program reviews, or any other means for recovering improperly expended funds. Additionally, these institutions are reminded that an HCM2 review does not constitute a complete file review and does not relieve active institutions of their obligation to conduct annual audits.

This is not the case for closed institutions. Closed institutions are subject to the wind-down provisions of 34 C.F.R. § 668.26. As Decker was first notified on September 5, 2005, these obligations include a close-out audit. During a close-out audit, the Department may process an HCM2 payment request, but it will withhold any approved payments pending resolution of the institution's close-out audit and other liabilities identified, such as closed-school-loan discharges.

Decker has not submitted an annual audited financial statement and compliance audit for its fiscal year ending June 30, 2005 and a close-out audit report for July 1, 2005 through September 30, 2005. As a result, Decker has not accounted for all Title VI funds received by the institution during the unaudited period, including Pell Grant funds and federal loan funds. At present, the United States calculates that the amount of federal loan funds owing is $950,164. With respect to Pell Grant funds, the total amount due and owing during the unaudited period is $14,402,359. The Department has also calculated $6,709,699 in closed-school discharges granted by the Department to Decker's students and parents, as of December 2016.

Further, the Department is owed funds under the Program Participation Agreement with Decker, including those findings in the Department's Final Program Review Determination which were affirmed in whole or in part by the Administrative Law Judge (ALJ). For example, the ALJ determined that the overall outstanding revised liability for Finding 2 is $2,249,416.00 in Federal Loan principal funds and $611,844.00 in Federal Pell Grant principal funds, which does not include any cost of funds associated with this Finding. With Finding 3 regarding second disbursement payments to students, the Department calculated a revised liability of $222,863. With Finding 4, the Department identified a revised liability of $103,287.00.

As we explained in our Objection to the Trustee's application to Employ Accounting Firm and Document Imaging Service (*Doc 697*), Decker owes a substantial sum of money to the Department, and it may be impossible for the College "to offset this debt with HCM2 reimbursements." Thus, in order to conserve the estate's scarce resources, we suggested that the Trustee conduct the HCM2 test review—rather than resolve the entire case with a costly close out audit—to the detriment of the estate.

**IV.    The United States will continue working with the Trustee and his counsel to effectuate a plan for determining what, if any, funds are owed the estate.**

We understand the Trustee has an immediate need for funding, in order to pay significant fees to Weworski & Associates and manage other estate costs. Likewise, we hope that you understand the United States must continue to comply with its fiscal procedures for ensuring the proper and efficient administration of funds received from the Secretary or from students under the Title IV, HEA programs. Acknowledging these opposite positions, we continue to believe this test review will help the estate determine whether it is fiscally responsible to expend funds to submit a formal HCM2 reimbursement request and subsequent close-out audit. And we plan to continue working on this test review with the estate.

Sincerely,

Jessica R. C. Malloy
Katie A. Bell

Enc.

# Exhibit A



**U.S. Department of Justice**

*United States Attorney*
*Western District of Kentucky*

RMC/kab/jrcm

717 West Broadway
Louisville, KY 40202
Website: www.justice.gov/usao/kyw

Phone: 502-582-5911
Fax: 502-582-5097

October 17, 2018

Jay Vaughn
11951 Freedom Drive
Reston, VA 20190-5656

Robert W. Keats
P.O. Box 221377
Louisville, Kentucky 40252-1377

Dear Jay:

Federal Student Aid has reviewed the list of 50 students submitted by your office, on September 26, 2018. As explained more fully below, this information is not sufficient to support Decker's request for funds. Accordingly, please supplement the Trustee's submission, per the instructions provided to you on August 8, 2018.

As a preliminary matter, the September 26, 2018 submission failed to include the required Form 270, Request for Title IV Reimbursement or Heightened Cash Monitory 2. (*See* § B of the August 8, 2018 instructions). Further, this submission failed to provide required student information to initiate a review, including, *inter alia,* personal identifiers, contact information, date of attendance, program of study, certification of satisfactory academic progress, grade point average, and expected family contribution. (*See* § C of the August 8, 2018 instructions). As FSA indicated in its letter detailing the procedures, the Trustee must provide this information and must do so in the format described. "If not submitted in this format, the Department reserves the right to reject the submission request for funds/authorization by the institution." *Id.*

Moreover, FSA cannot limit its review to the 50 students identified by the Trustee, on September 26, 2018. As we discussed, the Trustee must submit a spreadsheet of students containing the required information *for each student whom the institution is requesting funds.* (*See* § C of the August 8, 2018 instructions). Once this spreadsheet is received, FSA will identify a statistically random sample of 100 students from the spreadsheet. Thereafter, the Trustee will need to provide hard copy documentation for all 100 students in the sample, in compliance with the August 8, 2018 instructions. (*See* § D of the August 8, 2018 instructions).

As you know, the Trustee's request for funds will be reviewed by FSA located in Kansas City in conjunction with the Department of Education and our office. The Kansas City office has the historical knowledge of the college and prior reviews, which will be beneficial given the passage of time between the students' attendance at the school and this new review. As FSA's HCM2 review will be highly scrutinized by our office, your office, the Bankruptcy Court, and Decker College's creditors, any concern about the accuracy of the review should be alleviated.

If you have any questions, do not hesitate to contact us. Otherwise, we are eager to receive the Trustee's spreadsheet of students containing the required information so that FSA can identify a random sample of 100 students to begin the review.

Sincerely,

Katie Bell
Jessica R. C. Malloy
Assistant U.S. Attorneys

# Exhibit B



August 8, 2018

Robert W. Keats, Trustee
In re: Decker College, Inc.
PO Box 221377
Louisville, Kentucky 40252-1377

                              CERTIFIED MAIL
                              RETURN RECEIPT REQUESTED
                              7017 0530 0000 6247 3403

Re:    HCM2 Method of Payment
       OPE ID: 03077700

Dear Mr. Keats:

As you know, in June 2005, the Kansas City School Participation Division ("KCSPD")
transferred Decker College, Inc. ("Decker") to the Heightened Cash Monitoring 2 ("HCM2")
method of payment effective June 13, 2005. While Decker attempted to submit HCM2
submissions in 2005, those submissions were not approved by the Department of Education. In
accordance with Decker's bankruptcy proceedings pending in the United States Bankruptcy
Court for the Western District of Kentucky, Case No. 05-61805, the Department of Education
has agreed to review Decker's records again to determine whether Decker is entitled to
reimbursement of any funds under HCM2 for classes provided to students before its
recertification application was denied on September 30, 2005 and it ceased offering classes on
October 21, 2005.

This action is authorized by Section 415 of the General Education Provisions Act, 20 USC
1226a-1, and by the following program regulations: 34 C.F.R. § 668.162, Student Assistance
General Provisions.

Enclosed are the detailed instructions for all HCM2 requests using the requirements in the
Department of Education regulations in effect in 2005 at the time Decker College was originally
transferred to the HCM2 payment method. Please address all submitted requests and inquiries
regarding the HCM2 submission to:

Kathleen Shelton, Payment Analyst
U.S. Department of Education
Kansas City School Participation Division (KCSPD)
Federal Student Aid
1010 Walnut Street, Suite 336
Kansas City, MO  64106-2147



Federal Student Aid
An Office of the U S DEPARTMENT of EDUCATION

830 First Street  NE   Washington  DC 20202

Decker College
OPE ID: 03077700
Page 2 of 10

Phone: (816) 268-0445
E-mail: Kathleen.Shelton@ed.gov

Due to the pending bankruptcy, all communications with the Department must include Assistant
U.S. Attorneys, Katherine Bell and Jessica Malloy.  Please note that the HCM2 review does not
preclude the Department from asserting other defenses or claims, including claims of setoff, in
accordance with the Bankruptcy Code and orders issued by the Bankruptcy Court.

Sincerely,

Dvak Corwin
Compliance Manager
Kansas City School Participation Division
Federal Student Aid

Enclosures:    Instructions for Obtaining Funds under HCM2 Method of Payment
               Form 270 (Request for Title IV Reimbursement or Heightened
               Cash Monitoring)
               Student Data Spreadsheet

cc:    United States Attorney, Western District of Kentucky
       Jay Vaughn, Cooley LLP, One Freedom Square, Reston Town Center
          11951 Freedom Drive, Reston, VA 20190-5656

Decker College
OPE ID: 03077700
Page 3 of 10

## INSTRUCTIONS FOR OBTAINING FUNDS UNDER HEIGHTENED CASH MONITORING (HCM2) METHOD OF PAYMENT

The U.S. Department of Education (the "Department") has developed these instructions to minimize the documentation the institution must submit, as well as to facilitate the School Participation Division's review of that documentation. The School Participation Division ("SPD") reviews this documentation to determine the accuracy and reliability of the information submitted. If necessary, the SPD may require the institution to submit additional documentation of proper expenditures before the Payment Analyst disburses funds to the institution and/or before approving program authorization requests.

For the Federal Pell Grant (Pell) and Federal Supplemental Educational Opportunity Grant (FSEOG) programs, the institution must demonstrate that it properly complied with program requirements to determine, award, and disburse institutional funds to eligible students who were enrolled in and attending eligible programs. When the institution has demonstrated that it has expended these funds in accordance with Title IV requirements, the Department will reimburse the institution (or credit the institution's account from its latest existing cash on hand balance), subject to any right of offset available.

The institution is required under 34 C.F.R. § 668.162(d)(citation is 668.162(e) in prior regulation) to credit students' accounts for the amount and type of Federal aid they are eligible to receive prior to requesting reimbursement of those funds from the Department, and the institution must have transmitted and Pell and/or Direct Loan disbursements in COD prior to submitting the request. For students using Federal Family Educational Loans (FFEL), the institution may have certified FFEL loan applications without receiving prior approval from the Department, but the institution must report all students scheduled to receive initial and/or subsequent FFEL disbursements prior to releasing any funds.

Please note: Complying with HCM2 requirements does not relieve an institution of its obligation to submit payment data to the Department. This is discussed in Volume 4, Chapter 3 of the 2004-2005 edition of the *Federal Student Financial Aid Handbook-Requesting and Managing FSA Funds.*

## I. TECHNICAL ASSISTANCE

Please read these instructions carefully. These instructions have been written in a general manner in order to be used by all the various types of institutions that participate in the Title IV HEA student financial assistance programs. Since different institutions use different methods for recording, processing or storing information, or use different terminology for certain items, it is important to understand that it may be necessary to contact your Payment Analyst for clarification. If there are any doubts about the requested information, please clarify these issues with your Payment Analyst before submitting a request in order to avoid discrepancies and delays.

Decker College
OPE ID: 03077700
Page 4 of 10

## II. HCM2 SUBMISSIONS

Our office will accept and process only one HCM2 request during any 30-day time period. The institution may submit funding requests for multiple award years together – this will be considered one submission. However, a separate spreadsheet must be included for each award year.

Documentation in the submission will not be returned. Therefore, the Department strongly recommends that the institution maintain a copy of the HCM2 submission.

### A. Protection of Personally Identifiable Information

Personally Identifiable Information (PII) being submitted to the Department must be protected. PII is any information about an individual which can be used to distinguish or trace an individual's identity (some examples are name, social security number, date and place of birth).

PII being submitted electronically must be encrypted. The data must be submitted in a .zip file encrypted with Advanced Encryption Standard (AES) encryption (256-bit is preferred). The Department uses WinZip, however, files created with other encryption software are also acceptable, provided that they are compatible with WinZip (Version 9.0) and are encrypted with AES encryption. Zipped files using Win Zip must be saved as Legacy compression (Zip 2.0 compatible).

The Department must receive an access password to view the encrypted information. The password must be e-mailed separately from the encrypted data. The password must be 12 characters in length and use three of the following: upper case letter, lower case letter, number, special character. A manifest must be included with the e-mail that lists the types of files being sent (a copy of the manifest must be retained by the sender).

Hard copy and electronic files containing PII must be:

- sent via a shipping method that can be tracked with signature required upon delivery
- double packaged in packaging that is approved by the shipping agent (FedEx, DHL, UPS, USPS)
- labeled with both the "To" and "From" addresses on both the inner and outer packages
- identified by a manifest included in the inner package that lists the types of files in the shipment (a copy of the manifest must be retained by the sender).

PII data cannot be sent via fax.

### B. REQUIRED FORM/CERTIFICATIONS (blank forms enclosed)

The institution is required to submit a completed Form 270, Request for Title IV Reimbursement or Heightened Cash Monitoring 2 (HCM2) with each HCM2 submission. This form is used to request Title IV funds under HCM2.

The President, Owner or CEO and the comptroller and/or third-party servicer is required to certify that the information submitted to receive funds while under the HCM2 payment method is accurate. A false certification may result in civil or criminal action by the Department against the institution.

With each HCM2 request submitted, the institution must include one Form 270 per award year for which funds are requested. All Title IV program funds requested must be indicated on the Form 270 and it must be completed according to the instructions provided with the form.

When completing the Form 270, if Title IV adjustments are due when a student ceases attending and your institution has previously claimed more than the "earned" amount, the institution must net out these amounts when the next request for funds is made.

For example:
- An institution submits a request for Federal Pell funds for 20 students in the amount of $18,500 on the Form 270 (Section 6A).
- Five of the 20 students withdrew and a total refund of $3,500 has been calculated for those students and processed in COD. The institution must provide a separate withdrawal spreadsheet with student names and the amount of refunds. The institution would subtract the $3,500 from the claim, listing it as cash on hand on the Form 270 (Section 6B).
- Therefore, the institution would claim a total of $15,000 of funds on the Form 270 (Section 6C).

## C. REQUIRED STUDENT INFORMATION

The information listed below must be provided for each student for whom the institution is requesting funds in spreadsheet format (hardcopy and/or electronic). Submit a separate spreadsheet for each award year for which funds are requested. The student records on each spreadsheet must be alphabetized by student last name and then numbered in sequential order. A sample spreadsheet is enclosed. The spreadsheet should be modified to fit the school's situation. Any electronic spreadsheet submission must be in either Microsoft Excel or Access at the discretion of the Payment Analyst. Please contact your Payment Analyst to discuss this option in detail.

If Decker has not released outstanding disbursements from the Department into the institution's federal bank account for students prior to its transfer to HCM2, Decker must request payment for these students through the HCM2 process by reporting them on the student data spreadsheet and providing the required hard copy documentation identified in Section D.

The spreadsheet must contain the following information:

- Sequence Number
- Student Last Name
- Student First Name

Decker College
OPE ID: 03077700
Page 6 of 10

- Social Security Number
- Address (street, city, state, zip)
- Telephone Number
- Instructional Program
- Enrollment status (full-time, ¾ time, ½ time, < ½ time)
- Admission criteria used for the student's enrollment (high school diploma, GED, ability to benefit test, college transcript)
- Number of Clock or Credit (specify) hours in the student's program of study
- Number of Clock or Credit (specify) hours in the institution's academic year
- Number of Clock or Credit (specify) hours in the payment period
- Number of Clock or Credit (specify) hours completed by the student to date of payment
- Start date/re-entry date (if applicable)/withdrawal date (if applicable)/last date of attendance (if applicable) and midpoint date of student's program. For distance education programs, the first date the student logged on AND engaged in educational activity
- If student withdrew, the percentage of tuition retained
- Student's cost of attendance
- Direct education cost for enrollment period status
- Expected Family Contribution (EFC)
- Certification that student is making satisfactory academic progress (SAP) (qualitatively and quantitatively) – indicate yes or no
- Grade Point Average (GPA)
- Award amount currently requested for the student, by Title IV program for which authority to disburse is sought. Title IV programs are: Pell Grant, FSEOG, and Federal Loan. At the bottom of the spreadsheet, you must provide the total funds requested for each Title IV program.

Because the Institution is also a participant in the Federal Loan program, it must also include:
- Loan Period
- Grade Level
- Type of Loan

To reiterate, the institution must submit the above information in the format specified. If not submitted in this format, the Department reserves the right to reject the submission request for funds/authorization by the institution.

## D. REQUIRED HARD COPY STUDENT DOCUMENTATION

To support the request for funds, the institution must be able to provide copies of student records that demonstrate:
- The institution's students were eligible to receive their awards;
- The institution calculated student awards properly; and
- The institution has disbursed the award amounts to those students

Initial submission of hard copy student documentation will be capped at 100 students.
Institutions with 100 or fewer students on their payment submission should submit hard copy
documentation for all students. Institutions with 101 or more students must submit an electronic
list of all students (see Section C above for details) to the Payment Analyst who will select a
random sample of 100 students. The Payment Analyst will identify which 100 students the
institution with 101 or more students should provide initial hard copy documentation. The
Department reserves the right to collect hard copy documentation for any and all students
included on an institution's payment submission at its discretion.

For each student for whom the institution is supplying hard copy documentation, submit the most
recent copies of the requested documentation, alphabetically grouped by student, in the order
listed below.

- The ISIR upon which the disbursement is based, the ISIR prior to the one upon which the
  disbursement is based, and the most recent ISIR transaction if different. The ISIR must
  have all pages, an EFC, and all comment codes with related text.

- **Copies of official institutional student tuition account records**, documenting each
  completed transaction (including transaction date, description and debit or credit), by
  cash payment or credit, from the student's initial enrollment through the present.
  Records must be in chronological historical sequence. The records should demonstrate
  that the institution has properly credited the student's tuition account records with Title
  IV disbursements, return of Title IV funds, and paid credit balances.

- **Credit balance documentation**, demonstrating all student credit balances were
  liquidated. One of the options below must be provided:
  - Documentation of electronic transfer to the student bank account
  - Front and back copies of check to student
  - Receipt for cash disbursed, or
  - Return of credit balance to Title IV program
- **Proof of academic qualifications: verification of high school diploma/high school
  diploma equivalent. The following are acceptable forms of proof:**
  o High school diploma
    - Copy of high school diploma
    - Copy of high school transcript showing graduation date
    - Home schooling certification
  o Equivalent of high school diploma
    - GED
    - State Certificate if applicable
    - Academic transcript from completed two year program that is acceptable for
      full credit towards a bachelor's degree
    - Documentation that student excelled academically in high school, in an
      associate's degree program, etc. See regulation 600.2 (The institution must
      have a policy for admitting such persons.)
  o Documentation of a passing score consistent with test publisher requirements (e.g.,
    complete examination, score sheet and independent tester certification)

Decker College
OPE ID: 03077700
Page 8 of 10

- **Enrollment Agreement/Contract:** For institutions that execute, include the fully completed enrollment agreement or contract, including program name, cost, start date, student signature and date.

- **Institutional pre-enrollment documents if any**, including Application for Enrollment, Application for Financial Aid, Pre-enrollment Student Questionnaire, etc.

- **Complete verification documentation** (please see the Federal Student Aid Handbook Application and Verification Guide) for the applicable award years and the appropriate verification group.

- **Documentation of Return to Title IV funds** for withdrawn students for whom the institution is requesting HCM2/adjustment, including:
  o R2T4 calculation worksheet
  o Student withdrawal form for official withdrawals
  o Documentation of return of funds to the lender / the Department (e.g., front and back copies of check to the lender / the Department, copies of electronic transaction confirmations, Form 270 form showing downward adjustment, copy of negative disbursement record from COD)
  o Documentation of any Post Withdrawal Disbursement made to student
  o Documentation showing withdrawal information was reported to NSLDS

- **Attendance Documentation:** Source documents or summary document determined in consultation with the SPD.

- **Proof of Satisfactory Academic Progress**, including:
  o Academic Transcript for entire academic history with the institution, including:
    ▪ Grade Point Average (GPA)
    ▪ Cumulative GPA
    ▪ Hours/Credits attempted
    ▪ Hours/Credits completed
    ▪ Payment period
    ▪ Transfer hours/credits accepted
  o Documentation of any student appeal of failure to make SAP
  o SAP measurement documentation in the student file, if any

- **Award calculation**, by specific payment period and disbursement

- **Documentation to support any institutional intervention** in determining a student's eligibility, e.g., professional judgment, SAP appeals, dependency overrides, etc.

- **Documentation resolving conflicting and discrepant information**, (e.g., C- codes on the ISIR, name changes, gender ambiguity)

- **Additional relevant student file documents:** The Institution must submit any additional information relevant to determining the eligibility of students submitted for review. This must include documentation such as leave of absence documentation, an eligibility checklist, Financial Aid Director notations of changes to eligibility, counseling records pertinent to satisfactory academic and attendance progress, etc.

- **For Loan recipients,** entrance counseling documentation, including student signature and date.

If the institution is requesting authorization to release FFEL funds, it must also include with each request the following items:
- **Promissory Notes;**
- **Certification roster** of students for whom loans were certified since the last submission;
- **Copy of FFELP application(s),** with borrower and institutional sections completed (or alternative documentation if electronic processing);
- **Entrance Counseling Documentation;** and
- **Bank Statements** for account in which FFELP EFT funds are deposited.

## E. REQUIRED INSTITUTION INFORMATION

The institution must submit a copies of the following documents in place in June 2005:
- School Catalog
- Student Handbook
- Consumer Information handouts/addendums
- Satisfactory Academic Progress policy
- Attendance policy and description of method/system of documenting attendance, including how you determine whether or not the student withdraws, drops out or is expelled before his or her first day of class
- Return to Title IV policy
- FSEOG student selection policy
- Procedures for determining a withdrawn student's last day of attendance (official and unofficial)
- Refund policy
- Selection procedures for campus-based recipients
- Award formulas for each Title IV program and for each academic program
- Pell and Campus-Based cost of attendance/budget for each academic program
- Key/legend for any submitted documentation, e.g., account ledger, academic transcript
- Independent test administrator's ATB certification (if applicable)
- Formula for calculating students' Grade Point Average (GPA) if not included in Student Handbook or catalog
- For Campus-Based programs, method of matching federal share
- Information describing characteristics for each academic program to determine program type (term, non-term and non-standard term) and method of delivery (in-person, distance education, correspondence, or combination), Pell grant formula, disbursement schedule,

Decker College
OPE ID: 03077700
Page 10 of 10

academic year definition, minimum full time and borrower based vs. scheduled academic year

Please follow up with your Analyst to determine if these records must be included in submissions subsequent to your renewed request for funding.

## F. REQUEST FOR ADMINISTRATIVE COST ALLOWANCE

The institution will request Pell Administrative Cost Allowance (ACA) funds though the G5 system. If the institution is unable to receive ACA funds from G5, a letter on official letterhead with the amount/request must be provided with the submission. Do not indicate the ACA amount on the Form 270.

If you have any questions regarding these procedures, please contact Kathleen Shelton, Payment Analyst of the Kansas City School Participation Division– (KCSPD) at (816) 268-0445.

Attachments:
- Form 270
- Student Data Spreadsheet

# Exhibit C

**Malloy, Jessica (USAKYW)**

| | |
|---|---|
| **Subject:** | FW: Decker College 50 File Feedback Review |
| **Attachments:** | Stipulation as to Debtor's Heightened Cash Monitoring Submission to Dept.docx |

**From:** Bell, Katherine (USAKYW) 2
**Sent:** Tuesday, November 6, 2018 11:21 AM
**To:** 'Vaughan, Jay' <jvaughan@cooley.com>; 'Robert Keats' <rkeats@bellsouth.net>
**Cc:** Malloy, Jessica (USAKYW) <JMalloy@usa.doj.gov>
**Subject:** Decker College 50 File Feedback Review

Jay and Bob,

Attached is a Stipulation outlining the next steps in Decker's HCM2 review as ordered by Judge Fulton and agreed to by the parties. Please review and let me know if I have your permission to sign and file the Stipulation with the Court on your behalf.

The Department has arranged for analysts in Washington DC to do the 50-file HCM2 feedback review. Since this is a test review of the documents, for this review only the Department will not require the Trustee to submit all the supporting documentation with the HCM2 files, including the Form 270 and the Excel spreadsheet containing the required student information. The Department, however, reserves the right to require the Trustee to submit the spreadsheet and other information as needed to review the 50 files and provide feedback. In addition, the Form 270 and the Excel spreadsheet must be submitted for any future HCM2 requests.

Based on the information currently available, the Department believes the 50-file review may take 6-8 weeks complete. This schedule and the analysts completing the review may vary as we get into the holiday season. The Department is optimistic that the feedback review will provide the Trustee with more information about the state of Decker's documentation and potentially allow the Trustee and the accounting firm to identify and remove any problematic files from Decker's larger, formal HCM2 submission.

To start the review, we'll need the 50 student files. Can you let me know the size of the 50 student files (i.e. KB, MB, GB, Etc.) so that we can figure out the best way to electronically submit the information to the Department given the security protocols? Also, please confirm that all documents relating to each specific student will be submitted with the 50 file review. For example, any and all records relating to Jane Doe will be submitted in one electronic folder for Jane Doe. Finally, when will the 50 files be ready to submit to the Department? We have analysts on standby to start the review and we'd like to get started before the holiday season.

If you have any questions about the above, please give me a call. Thanks,

Katie Bell


Katherine Bell (Katie)
Assistant U.S. Attorney
U.S. Attorney's Office, W.D. KY.
717 West Broadway
Louisville, KY 40202
PH: (502) 582-5094
Cell: (502) 438-3356
Fax: (502) 625-7110

Email: Katherine.bell@usdoj.gov

# Exhibit D

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
Electronically Filed

IN RE:                                    )
                                          )
DECKER COLLEGE, INC.                      )        CASE NO. 05-61805(2)
          Debtor.                         )        CHAPTER 7
                                          )
_____ )

## STIPULATION AS TO DEBTOR'S HEIGHTENED CASH MONITORING SUBMISSION TO DEPARTMENT

The Trustee and the United States of America, on behalf of the Department of Education ("Department"), stipulate to the following in connection with Decker College's forthcoming heightened cash monitoring ("HCM2") reimbursement requests:

To address the concerns of the Trustee and other creditors, with the exception of one employee, the Department's HCM2 review will be conducted and supervised by Federal Student Aid employees located outside of the Kansas City FSA Office. The parties agree that this arrangement constitutes an impartial review.

To provide guidance to the Trustee and his accountant regarding the HCM2 review process, the Department will conduct a test review of fifty student files submitted by the Trustee. After this test review is complete, the Trustee will make a reimbursement request in accordance with the directions provided by the Department on August 8, 2018.

The parties will discuss the status of the Department's HCM2 reimbursement request review with the Court at the hearing in March 2019. Additionally, the Trustee will submit regular reports to the Court to keep all parties apprised of the status of the Trustee's HCM2 reimbursement requests.

HAVE SEEN AND AGREED TO BY:

_____

Katherine A. Bell
Jessica R. C. Malloy
Assistant U.S. Attorney
717 West Broadway
Louisville, KY 40202
Ph: (502) 582-5094
Email: Katherine.bell@usdoj.gov
ATTORNEY FOR UNTIED STATES


_____

Robert W. Keats, Trustee
P.O. Box 221377
Louisville, KY 40252-1377


_____

Jay Vaughn
Cooley, LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004-2400
Ph: (202) 776-2865
Email: jvaughn@cooley.com
COUNSEL FOR TRUSTEE


## CERTIFICATE OF SERVICE

    A true and correct copy of the foregoing was filed on _____ using the Court's

electronic filing system, which will send notice to all parties requesting notice in this action.


           *s/ Katherine A. Bell*_____
           Katherine A. Bell
           Assistant U. S. Attorney

# Exhibit E

# Cooley

Joseph J. Vaughan
+1 202 776 2031
jvaughan@cooley.com

May 29, 2019

Katherine A. Bell
Jessica R. C. Malloy
Assistant United States Attorneys
U.S. Department of Justice
717 West Broadway
Louisville, KY  40202

**Re:    Decker College (OPEID 03077700)
        Response to ED File Review Letters**

Dear Jessica and Katie:

We reviewed the letter drafted by U.S. Department of Education ("Department" or "ED") analyst
Lonny Meloon dated May 19, 2019, as well as your cover letter dated May 20, 2019, responding
to the Heightened Cash Monitoring 2 ("HCM2") reimbursement request that Decker College
("Decker" or the "Estate) submitted in December 2018.  As you are aware, these letters provide
the first substantive responses we have received to this initial 50-file submission more than five
months after Decker submitted the request and well beyond the stated processing time of 30 days
outlined in the HCM2 procedures.  This letter summarizes the Estate's responses to the
observations and hopefully will avoid future misunderstandings and delays associated with the
accompanying request for reimbursement.

*Cover Letter dated May 20, 2019*

1.  *FFELP loans for which Decker is requesting reimbursement might have been "written off or
    closed" by ED "since the 2005 bankruptcy filing through the Department's administrative
    process" (pg. 1)*

    It is immaterial to the Estate's reimbursement request that ED might have closed or written
    off FFELP loans through its unrelated administrative processes, and such actions do not
    constitute a valid reason to reject a request for funds to which the Estate is otherwise entitled.
    Any loans that were written off, closed, or discharged subsequent to Decker's placement on
    HCM2 impacted the amount a borrower owes the lender (or the Department), not the amount
    the Estate should have received and is now due. If the Department voluntarily chose to
    eliminate possible sources of funding to satisfy amounts due to Decker, ED must find other
    sources. Furthermore, the Department cannot force the Estate to spend millions to adjudicate
    its claims and then cite the time it took to complete that process or interim efforts by the
    agency to eliminate funding sources as grounds for denying repayment.

# Cooley

Katherine A. Bell
Jessica R. C. Malloy
May 29, 2019
Page Two

2.  *FFELP lenders and appropriations are "no longer available" (pg. 1)*

    The availability of the FFELP lenders or appropriations are also not relevant to the request.
    The Department withheld from Decker earned funds to pay for the educational services it
    provided to students, relying on the COE letter subsequently confirmed to be inaccurate.
    Decker would have been eligible to receive such loan proceeds but for the Department's
    action, and the Department's own Administrative Law Judge (as affirmed by the Secretary of
    Education) overturned the basis for denying Decker's receipt of funds. The source (or
    sources) of the funds to reimburse Decker is up to the Department, but the unavailability of
    the original lenders does not impact the obligation.

3.  *How does Decker "intend to impose loans on former Decker students" (pg. 1)*

    To be clear, the Estate is not "imposing loan debt" on former Decker students and has never
    asked the Department or the Court to do so. Decker provided educational services to the
    eligible students for whom it is requesting reimbursement pursuant to the HCM2 process the
    Department created and imposed, and is now simply continuing the request that was paused
    while agency and legal appeal reviews ran their course. Now that an Administrative Law
    Judge, the former Secretary of Education, and multiple federal courts have reached their
    determinations in Decker's favor, the Estate is submitting a request for disbursement
    amounts that are substantiated by signed promissory notes ("MPNs"). As previously
    described, where the Department secures funds to satisfy its obligations is left to the agency,
    and the Estate takes no position with respect to the preferred source(s) of those funds.

*Letter from ED dated May 19, 2019*

As an initial matter, the letter states that the MRFSPD "applied the Department's internal
procedures for evaluating student files under the Department's Heightened Cash Monitoring 2
('HCM2') payment method[,]" but then cites procedures, standards, or regulatory requirements
that were not in effect during the 2004-2005 and 2005-2006 award years as the basis for findings
or assumptions. In this recent correspondence providing feedback regarding the review of the
initial submission of 50 files, the Department not only tried to expand the scope of the review,
but also referenced standards that never existed or were implemented well after Decker closed.

1.  *ED describes two student ledger accounts in each student's file, one from 2005 and one
    created by Weworski that in some cases includes adjustments not reflected in the 2005 ledger
    (pp. 2-3). ED asks for clarification regarding (1) which transactions "actually occurred and
    occurred with authorization," and (2) the nature and purpose of the adjustments identified
    on the Weworski ledger.*

# Cooley

Katherine A. Bell
Jessica R. C. Malloy
May 29, 2019
Page Three

Weworski and the Estate, through its counsel, explained the two student ledger accounts to the AUSAs in a telephone conference on March 12, 2019, and followed up with the following explanation sent via email on March 20, 2019.

> Two ledger cards: *With respect to students in the December 2018 submission who have two ledger cards, one ledger card was prepared at the time Decker was active and one was prepared by the accountants to capture information relevant to the reimbursement request, e.g., revised Pell Grant disbursement (see "Voiding/Adjustment of Pell Grants" explanation that follows).*

> Voiding/Adjustment of Pell Grants: *In the M. Boardman file discussed on our March 12, 2019 call, the student ledger card entries in the ledger prepared by the accountants posting Pell Grant proceeds totaling $2,025 followed by subsequent transactions adjusting and eventually reinstating the original Pell Grant amount were the result of since overturned guidance from the Department of Education Case (ED) Team. ED had directed Decker to reduce the original amount to $1,822.50 due to what the agency believed was the erroneous application of the Pell Grant formula, but the ED Administrative Law Judge who considered the appeal of the Program Review subsequently agreed with Decker that the Pell Grant formula used to calculate Pell awards was accurate. As a result, the accountants voided the $1,822.50 amount and the original award of $2,025 was reinstated.*

Contrary to the Department's suggestion that the Weworski adjustments suggest that the transactions did not "occur[] with authorization," the adjustments in fact represent corrections to the Department's erroneous instructions to Decker in 2005, which the ALJ determined to be contrary to the regulations in Finding 5 of the Program Review. *See* U.S. Dep't of Educ., *In the Matter of Decker College*, 06-22-SP (March 15, 2016), 13. FSA did not appeal this conclusion. Stated more directly, the entries are retroactively correcting mistakes made by the Department during the reimbursement process.

When Decker was still operating, students were originally packaged with Pell awards of $2,025, but in conjunction with the program review after the Department denied an initial request for funding, ED instructed Decker to calculate Pell Grants using the formula in 34 C.F.R. § 690.63(a)(4), which resulted in Pell awards of $1,822.50. ED threatened that if Decker did not do so, no reimbursements would be processed. Decker disagreed with this mandate (and the administrative process subsequently proved Decker was correct), but at the time, Decker was unable to delay the potential receipt of proceeds by subjecting the request to administrative review. Decker therefore granted the students "institutional scholarships" in the amount of $202.50 in order to make up the difference. However, years later, the Administrative Law Judge conclusively decided that "Decker was under no obligation to use

# Cooley

Katherine A. Bell
Jessica R. C. Malloy
May 29, 2019
Page Four

the calculations required by 34 C.F.R. § 690.63(a)(4)" and overturned the Department's assessment of liability on this basis, which confirmed the original request including the proper Pell award of $2,025. *Id.* In some cases, Weworski identified proof of origination for the $1,822.50 in NSLDS records, leaving $202.50 as the amount for which Decker is owed reimbursement.

Clearly, there was no possibility for the Estate to pull historical student ledgers to submit with the reimbursement request more than a decade after the school closed. Accordingly, Weworski created ledgers based on available documentation, which was the only way to produce accurate ledgers that are substantiated by documentation and reflect a proper calculation of Pell Grants, showing student eligibility and funds scheduled and disbursed.

With respect to ED's statement in the May 19, 2019 letter that "Decker must submit documentation which demonstrates that Decker properly originated all the FFELP Stafford Subsidized and Unsubsidized Loans," this indicates a patent misstatement of HCM2 rules and directions that ED gave Decker in 2005. As stated in the Department's June 14, 2005 letter to Decker regarding the imposition of HCM2 (p.2):

> *Decker is prohibited from disbursing Federal Family Education Loan (FFELP) funds without prior approval from the Department. Federal regulations prevent institutions on the HCM2 method of payment from disbursing FFELP funds without the prior approval of the Department.*
>
> *Effective June 13, 2005, if Decker wishes to obtain Federal Pell Grant, Campus-Based, and Federal Direct Loan funds under the HCM2 payment method, the institution must first make disbursements to students and parents or the amount of funds that those students and parents are eligible to receive, before Decker may seek reimbursement from the Department for those disbursements. The Department considers the institution to have made a disbursement if Decker has either credited a student's account or paid a student or parent directly with its own funds.*

Furthermore, all FFELP MPNs, budget worksheets, student award letters, entrance counseling and NSLDS documents are included in the December 2018 file submission to the Department to substantiate the reimbursement amounts, so it is unclear why ED suggests that the documentation to support the certification of the Stafford loans has not been provided. Departing even further from the instructions given to Decker in 2005 – despite the statement that "Decker would also be expected to demonstrate that its actions were consistent with the requirements Department imposed in 2005" – the May 19, 2019 letter states that Decker would have to provide documentation that students were provided notifications, a condition

# Cooley

Katherine A. Bell
Jessica R. C. Malloy
May 29, 2019
Page Five

not required as part of the HCM2 requirements and one that has no impact on student eligibility.

2.  *ED requests additional information regarding Decker's academic calendar, academic terms, payment period and credits (p. 6), stating that it "did not have copies of Decker's school catalog, academic calendar, or other institutional information that might have made this information clear to us."*

The Estate did not provide these specific items with the submission in December 2018 because it expected that ED would have this information in its files. However, for the Department's convenience, the Estate is attaching the catalogs and other institutional policies (as summarized under heading five, below) and provides the following definitions and details regarding the structure of Decker's programs:

- o   For all programs, academic progress measured in quarter credit hours.
- o   With respect to Decker's Business and Technology programs:
    - Academic year = 36 weeks, in which a full-time student was expected to complete three quarters of enrollment with a minimum of 12 credit hours per quarter.
    - Standard term, with the payment period = a quarter (the academic term)
- o   With respect to Decker's Construction Trade programs:
    - Academic year = 30 weeks, in which a full time student was expected to complete 36 quarter credit hours (i.e., made up of two non-standard terms of 15 weeks and 18 credit hours)
    - Non-standard term, with the payment period = non-standard 15 week academic term

A.  *ED noted "conflicting information" in student ledger account identifying a different LDA from the LDA on the grade history report (p. 6).*

Weworski and the Estate, through its counsel, previously explained to the AUSAs (during the telephone conference on March 12, 2019 and in a follow-up email on March 20, 2019) why the LDAs do not reflect "conflicting information" or inconsistent data. Any LDA reported on a student's ledger card is a *snapshot of the student's enrollment status on the date that the ledger was generated.* For the student identified on page 5, the data from Decker's administrative system indicated that the student last participated in an academically related activity on August 24, 2005, and the student's enrollment status was "Active." The LDA on the grade history report is the student's enrollment status *as of the date the grade history report was generated,* showing the student with an enrollment status of "Active" and reflecting the date the student last participated in an academically related activity as September 1, 2005. Again, this is not "conflicting information," but rather snapshots of an

# Cooley

Katherine A. Bell
Jessica R. C. Malloy
May 29, 2019
Page Six

actively enrolled student's most recently completed academically related activity as of the report date.

> B.  ED requested an explanation of how students could be enrolled in the same program and courses, with the same start date, but have a different LDA (p. 8).

ED requests an explanation of how it is possible for two students enrolled in the same program and courses, with the same start date, could have a different LDA, "within the structure of [Decker's] term based program." This question is based on the inaccurate assumption that the program was term-based. As explained earlier in this response, the program was in fact a non-standard term program. Furthermore, as shown in the screenshots in the Department's letter, the second transcript notes that the student was "in progress" and was registered for "Alternate Currents/Motor theory" but had not yet completed or received a grade, which is entirely consistent with the later LDA.

3.  *ED states that Decker "must explain how it was able to provide an amount of direct faculty instruction or classroom instruction, and ensure that students were completing out of class hours required in an amount that reasonably approximates the amount of academic activity required to earn each credit attempted and earned" (pp. 9-10).*

This section is based entirely on the improper premise that in order to establish student eligibility for the reimbursement amount requested, Decker must demonstrate its compliance with a definition of a credit hour that did not exist in federal requirements at the time Decker was in operation.  As stated <u>in no uncertain terms</u> in the preamble to the Notice of Proposed Rulemaking when the Department proposed a credit hour definition for degree programs for the first time in 2010 (well after Decker closed), no such requirement existed before 2010:

> **There is no definition of a credit hour in any current regulations for programs funded under the HEA;** *and the term is not defined in the regulations that set out the requirements for the Secretary's recognition of accrediting agencies or State agencies for the approval of public postsecondary vocational education. ... The Department proposes to add to § 600.2 a definition of a credit hour that would measure credit hours in terms of the amount of time and work during which a student is engaged in academic activity using commonly accepted academic practice in higher education, and further would provide for institutionally established equivalencies as represented by learning outcomes and verified achievement.*

75 Fed. Reg. 34806, 34810 (June 18, 2010) (emphasis added).

# Cooley

Katherine A. Bell
Jessica R. C. Malloy
May 29, 2019
Page Seven

The Department's Dear Colleague Letter ("DCL") from March 18, 2011 (GEN-11-06) explains that the regulatory definition of a credit hour that was proposed in 2010 was developed after the ED Office of Inspector General reviewed several regional accrediting agencies and determined that "the oversight of institutional assignment of credit hours insufficient at all three agencies." For example, one of the OIG reports states, "SACS does not provide institutions with specific criteria on what would constitute sound and acceptable practices for determining the amount and academic level of credit for courses. *See Report on the Southern Association of Colleges and Schools Commission on Colleges Standards for Program Length,* ED-OIG/I13J0004 (November 24, 2009), at four. Elsewhere, the report states, "SACS does not have a minimum standard related to the definition of a credit hour and does not provide criteria for reviewers to use to evaluate sound and acceptable practices for assigning credit hours." Although SACS did not accredit Decker, the Department's review of the agency and emphasis on the lack of any clear guidance regarding the definition of a credit confirm that even years later, there was no established guidance for colleges to follow.

Even if these subsequent regulations did apply, the Department clarified – and repeatedly emphasized – there is no seat time requirement in the definition of a credit. Excerpts from the previously referenced DCL (with page references in parenthesis) issued to help clarify the requirements associated with the rule include:

- *However, the regulations are grounded in commonly accepted practice in higher education, do not intrude on core academic decisions made by institutions and their accrediting agencies, and are completely consistent with innovative practices such as online education, competency-based credit, and academic activities that do not rely on 'seat time. (p. 1)*

- *The definition provides several critical flexibilities for institutions in determining the appropriate amount of credit hours for student coursework:*
  - *The institution determines the amount of credit awarded for student work. It is up to institutions to gain the confidence through peer review in the accreditation process that their credit hour policies and practices consistently meet conventional academic expectations.*
  - *A credit hour is expected to be a reasonable approximation of a minimum amount of student work in a Carnegie unit in accordance with commonly accepted practice in higher education. It is important to note that there is no requirement that a credit hour exactly duplicate the amount of work in paragraph (1) of the definition, as is highlighted by the provisions of paragraph (2). The requirement is that a credit hour reasonably approximate that minimum amount of work in paragraph (1).*

# Cooley

Katherine A. Bell
Jessica R. C. Malloy
May 29, 2019
Page Eight

- o *The credit hour definition is a minimum standard that does not restrict an institution from setting a higher standard that requires more student work per credit hour.*
- o *The definition does not dictate particular amounts of classroom time versus out-of-class student work.*
- o *In determining the amount of work the institution's learning outcomes will entail, as under current practice, the institution may take into consideration alternative delivery methods, measurements of student work, academic calendars, disciplines, and degree levels.*
- o *To the extent an institution believes that complying with the Federal definition of a credit hour would not be appropriate for academic and other institutional needs, it may adopt a separate measure for those purposes. (pp. 2-3)*

- *The credit hour definition does not emphasize the concept of 'seat time' (time in class) as the primary metric for determining the amount of student work for Federal purposes. Institutions may assign credit hours to courses for an amount of work represented by verifiable student achievement of institutionally established learning outcomes. Credits may be awarded on the basis of documentation of the amount of work a typical student is expected to complete within a specified amount of academically engaged time, or on the basis of documented student learning calibrated to that amount of academically engaged time for a typical student. Thus, the definition for Federal purposes represents nothing new in this regard. (p. 4)*

- *A credit hour for Federal purposes is an institutionally established equivalency that reasonably approximates some minimum amount of student work reflective of the amount of work expected in a Carnegie unit: key phrases being 'institutionally established,' 'equivalency,' 'reasonably approximate,' and 'minimum amount.' Further, the definition does not dictate particular amounts of classroom time versus out-of-class student work, and an institution may use alternative delivery methods, measurements of student work, or academic calendars to determine intended learning outcomes and verify evidence of student achievement. (p. 10)*

ED therefore cannot apply standards that simply did not exist anywhere during the period in question and especially not as part of an HCM2 request. Furthermore, even if ED attempted to apply these future requirements and the related DCL, they would support Decker's argument that there is no seat time requirement associated with awarding credit. The Department has already conducted a program review of Decker, for which it issued an FPRD without any reference to credit hours and yet again appears to be raising new issues (even if inadvertently supportive of Decker's request).

Cooley

Katherine A. Bell
Jessica R. C. Malloy
May 29, 2019
Page Nine

Furthermore, the Department's analysis is based on the incorrect assumption that all classes have an equal number of weeks of instruction for the varying number of credits earned by class. The Construction Trade programs were offered in a non-standard term format, not using a standard quarter academic calendar, and therefore course lengths differ.

4.  *ED raised the question of "whether Decker in fact was actually offering eligible programs" for the sole reason that, among the 50 files reviewed, they did not see evidence that "any student attended any time period after the first term" (p. 11).*

The question of whether Decker was offering eligible programs is precisely what Decker has spent the last 14+ years successfully demonstrating in numerous judicial and administrative venues. Program eligibility has absolutely nothing to do with the (incorrect) observation that files presented for review are limited to students who did not progress in enrollment beyond the first payment period or for whom Decker only requested reimbursement for the first payment period. In fact, academic transcripts for 15 of the 50 students submitted to ED for review show that students attended classes beyond the first non-standard term payment period, but that point again has nothing to do with program eligibility. Because ED was attempting to review the files without first considering basic facts previously provided to agency counsel, such as whether each program was standard term or non-standard term, its interpretation of <u>every</u> file was inaccurate. Even if the Estate had not submitted files with any students who continued past the first payment period, the Department is very aware that institutions requesting reimbursement request payment on a rolling basis, even for the same student. Decker has, and will, present files for students who advanced to the second enrollment period, and this has nothing to do with program eligibility.

5.  *Specific Documentation Requests*

This disconnect between the materials available to the reviewers and the information Decker previously provided to the government is concerning. We cannot understand how ED could even attempt to review the files submitted by the Estate without the underlying policies and procedures, the academic calendar, and other basic documents. Equally as troubling is the fact that the Department waited until minutes before the status hearing to share this information. Nevertheless, for the Department's convenience, we again provide the following information to the observations provided by the Department:

*   *Number and type (e.g., semester, trimester, quarter, other) of credit hours and the number of weeks in the student's program of study.*

# Cooley

Katherine A. Bell
Jessica R. C. Malloy
May 29, 2019
Page Ten

All of Decker's programs are measured in quarter credit hours. Please see attached for a chart identifying the number of credit hours and weeks in Decker programs offered during the 2004-2005 and 2005-2006 award years, for which the Estate is requesting reimbursement.

- *Number of credit hours and weeks in the student's academic year. Number of credit hours and weeks in the student's academic term. Number of credit hours and weeks in the student's payment period.*

  o With respect to Decker's Business and Technology programs:
    - Academic year = 36 weeks, in which a full-time student was expected to complete three quarters of enrollment with a minimum of 12 quarter credit hours per quarter
    - Standard term, with the payment period = a quarter (the academic term)
  o With respect to Decker's Construction Trade programs:
    - Academic year = 30 weeks, in which a full time student was expected to complete 36 quarter credit hours (i.e., made up of two non-standard terms of 15 weeks and 18 quarter credit hours)
    - Non-standard term, with the payment period = non-standard 15-week academic term

- *School Catalog including academic calendar and educational program information.*

  Attached are copies of Decker's 2004-2005 and 2005-2006 academic catalogs. Please see pages 10-12 of the 2004-2005 catalog and page 10 of the 2005-2006 catalog to review the academic calendar for each respective award year.

- *Attendance policy and description of method/system of documenting attendance, including how Decker determined whether or not a student withdraws or drops during the payment period.*

  Please see attached compilation of Decker policies.

- *Return of Title IV policy.*

  Please see pages 19 and 20 of the 2004-2005 catalog and page 24 of the 2005-2006 catalog to review the Return of Title IV policy for the corresponding award year.

# Cooley

Katherine A. Bell
Jessica R. C. Malloy
May 29, 2019
Page Eleven

- *Procedures for determining a withdrawn student's last date of attendance (official and unofficial).*

  Enclosed is the Decker College Determination of Last Date of Attendance policy for the 2004-2005 and 2005-2006 award years (official and unofficial withdrawals).

- *The student's course schedule (for each student in the submission).*

  Please reference the academic transcript ("grade report") in each student's reimbursement package submission.

- *The method by which the institution determined that a student completed an amount of academic activity that reasonably approximates one hour of classroom or direct faculty instruction and two hours of outside classroom for each credit attempted.*

  This standard was not applicable during the period in question. As previously noted, the Department has repeatedly confirmed it had no definition of a unit of credit for the programs subject to the request for repayment.

- *Explanation of how students were able to complete the amount of academic activity to earn large number of credits in compressed timeframes.*

  Again, the Department had no standard related to the definition of a unit of credit for financial aid purposes for degree programs and fully transferable nondegree programs.

- *Evidence that any Decker students attended classes beyond the first term and evidence that Decker students successfully completed the program.*

  Please reference response under heading two, letter from ED to AUSAs. The reimbursement submission packages for the students listed below include academic transcripts confirming Decker students attended classes beyond the first non-standard term, payment period.

  1. Student Sequence Number 5 (2004-2005 Award Year)
  2. Student Sequence Number 7 (2004-2005 Award Year)
  3. Student Sequence Number 1 (2005-2006 Award Year)
  4. Student Sequence Number 3 (2005-2006 Award Year)
  5. Student Sequence Number 4 (2005-2006 Award Year)
  6. Student Sequence Number 7 (2005-2006 Award Year)
  7. Student Sequence Number 8 (2005-2006 Award Year)

# Cooley

Katherine A. Bell
Jessica R. C. Malloy
May 29, 2019
Page Twelve

      8. Student Sequence Number 10 (2005-2006 Award Year)
      9. Student Sequence Number 11 (2005-2006 Award Year)
    10. Student Sequence Number 12 (2005-2006 Award Year)
    11. Student Sequence Number 13 (2005-2006 Award Year)
    12. Student Sequence Number 14 (2005-2006 Award Year)
    13. Student Sequence Number 15 (2005-2006 Award Year)
    14. Student Sequence Number 16 (2005-2006 Award Year)
    15. Student Sequence Number 18 (2005-2006 Award Year)

Decker began offering Title IV funds to students enrolled in the Construction Trade programs April 28, 2004 cohort. The start date for this cohort was April 28, 2004 and program end date was September 18, 2005.

- *Evidence that FFEL Program loans identified on the Weworski ledger card were disbursed and delivered to students.*

  Please reference response under heading one, letter from ED to AUSAs.

- *Information reconciling discrepant information reported on the Weworski and School Ledger cards.*

  Please reference response under heading one, letter from ED to AUSAs.

<u>Conclusion</u>

The Department's letter creates the impression that it is attempting to find every possible rationale, no matter how tenuous or inapplicable, for refusing to reimburse the Estate and raising new issues to further delay the eventual payment. Based on the Department's comments at the hearing and confusion regarding the purpose of this and other submissions, we also clarify that the latest request for payment that accompanies this submission is not advisory and includes the original 50 files that prompted this feedback. Accompanying this letter is a formal request for approximately $3.6 million in funds, and we look forward to the Department's feedback on this request – hopefully now with an accurate perspective – within the next 30 days, per ED's explicit policy.

# Cooley

Katherine A. Bell
Jessica R. C. Malloy
May 29, 2019
Page Thirteen

Respectfully Submitted,

Joseph J. Vaughan
Counsel to the Estate

Enclosures

cc: Robert Keats, Trustee