# EXHIBIT F



**U.S. Department of Justice**

*United States Attorney*
*Western District of Kentucky*

---

RMC/kab/jrcm

717 West Broadway
Louisville, KY 40202
Website: www.justice.gov/usao/kyw

Phone: 502-582-5911
Fax: 502-582-5097

*VIA EMAIL ONLY*

October 7, 2019

Bob Keats
P.O. Box 221377
Louisville, KY 40252-1377
rkeats@bellsouth.net

Jay Vaughn
11951 Freedom Drive
Reston, VA 20190-5656
jvaughan@cooley.com

**RE: Decker College 50-File Test Review**

Dear Jay and Bob:

This letter is in response to our prior correspondence and meetings regarding the 50 student files submitted by Decker College and the test review of these files conducted by the Multi-Regional and Foreign Schools Participation Division of the U.S. Department of Education, Office of Federal Student Aid ("MRFSPD"). It addresses three pieces of critical information requested by MRFSPD in connection with the test review and the Trustee's refusal to provide this information.

As you are aware, on September 30, 2005, the Department denied Decker's Application for Approval to Participate in Federal Student Aid Programs, "in order to protect Title IV, HEA program funds." In the denial, the Department found that "Decker's non-compliance and breach of fiduciary duty [wa]s severe." *See* United States' Response to Debtor's Motion to Convert to Chapter 11, *(DN 661)*, Exhibit Y. The Department also found that Decker demonstrated a significant lack of administrative capability, because it failed to pay almost $7 million in refunds to the Department and violated HCM2 requirements by receiving FFEL funds on behalf of its students without prior approval and required authorization. *Id.* Despite being informed of the right to challenge the denial, no challenge was made, and that decision is now final.

To further protect Title IV, HEA program funds, the Department promulgated regulations

1

which only permit the Department to reimburse funds "upon a determination that the applicable expenses have been properly paid." *See Burbank College of Court Reporting, Inc. v. U.S.*, 26 Cl. Ct. 323, 327 (1992); *see also* 34 C.F.R. § 690.74 ("The Secretary provides funds . . . based on the Secretary's determination of the institution's . . . need for reimbursement."). Because of the questions raised by Decker's management of student financial aid funds, the Secretary exercised that broad discretion and insisted that the statutorily mandated audits be undertaken before Decker be reimbursed. *See Pender Peanut Corp. v. U.S.*, 20 Cl. Ct. 447, 451-52 (1990).

Indeed, the institution received notice in 2005 that the Department would review an HCM2 submission to "determine the accuracy and reliability of the information submitted by the institution." *See DN 661*, Exhibit F, pg. 3. To that end, the Department could "require the institution to submit additional documentation of proper expenditures before the Team make a payment to the institution . . . ." *Id.* Accordingly, based on this broad discretion, the United States maintains that the requested information discussed in detail below was relevant in 2005 and, to protect Title IV, HEA Program funds, further explanation must be provided in any future request by Decker.

    a.    **The Trustee must explain the method used by Decker to determine that a student completed an amount of academic activity that reasonably approximates to one hour of instruction and two hours of outside classroom work for each credit attempted.**

When reviewing the test files, MRFSPD noted that several students completed 18 or more credit hours in eight or fewer weeks of instruction, which would require an exorbitant amount of work by the student in a short period of time to justify the credits earned. As a result, MRFSPD requested Decker explain how the institution provided and the students completed "the amount of academic activity required to earn each credit attempted and earned." *See* MRFSPD Letter dated May 19, 2019, pp. 9-10. In response to this request, the Trustee maintains that there was no definition of a credit hour in the Department's regulatory framework in 2005; therefore, the Trustee refuses to provide this information.

The United States respectfully disagrees with the Trustee's interpretation of the guidance in 2005 and is troubled by the Trustee's ultimate refusal to provide the requested information. In 2005, 34 C.F.R. § 668.8(k) provided that an institution offering "an undergraduate educational program in credit hours" (like Decker) must use the formula in § 668.8(l) to determine if the institution is offering an eligible program. Under the formula found in § 668.8(l), "[a] quarter hour must include at least 20 hours of instruction." Thus, even under the 2005 regulations, a quarter hour (or a semester hour or trimester hour) of credit must include a specific amount of instruction to qualify for Title IV funds from the Department.

While the regulations in 2005 did not contain a federally codified definition of a credit hour, the Department of Education maintained requirements in 2005 relating to the amount of instruction needed to justify a credit. In 1993, the Department of Education noted that "[u]nder the standard unit of measuring credit in higher education, the Carnegie Unit of Credit, one credit

2

hour consists of one hour of classroom work and two hours of outside preparation a week over the course of an academic term. For example, one semester hour requires one hour of classroom work and two hours of outside preparation a week during a semester." *See* 58 Fed. Reg. 39622 (July 23, 1993).

Similarly, this information is included in FSA Handbooks. For instance, the 2004-2005 Federal Student Aid Handbook provides that a student's attendance is measured by "one of several commonly accepted academic standards" including that a credit hour of instruction includes two hours of homework for each hour of class attendance. *See* FSA Handbook, Volume 2 (School Eligibility and Operations), Chapter 4 (Program Eligibility), on page 2-55.[1]

In order to obtain reimbursement of Title IV funds, an institution is required to submit "financial and student records . . . sufficient to prove that disbursement of the funds was properly made" by the institution. *Burbank College of Court Reporting, Inc. v. U.S.*, 26 Cl. Ct. 323, 325 (1992) (citing 20 U.S.C. § 1094(c)(1)(A)(i-ii). To receive Title IV funds, the institution must ensure that an "eligible student" is attending an "eligible program." *See Mission Grp. Kansas, Inc. v. Spellings*, 515 F. Supp. 2d 1232, 1235 (D. Kan. 2007) (citing 20 U.S.C. § 1070 *et seq.*). Based on these requirements in place in 2005 and the information disclosed in the 50-file test review, the MRFSPD needs the Trustee to explain how Decker students were able to complete the appropriate amount of instruction in a short period of time to justify the credits they attempted or earned.

A further review by the MRFSPD team of Decker's 2004-2005 and 2005-2006 catalogs has raised additional questions and concerns about the length of Decker's programs, including the construction degree programs, and whether these programs complied with § 668.8(k). The 2004-2005 and the 2005-2006 catalogs contain varying definitions about the length of the academic year for Decker's Construction Trade Programs. One catalog describes the academic year as a 33-week period involving 36 credit hours. The other catalog describes the academic year as 30 weeks with 36 credits. This difference must be explained and documented in connection with any reimbursement request. Additionally, the catalogs infer that students in the carpentry program may actually complete the program in much less time. This further complicates MRFSPD's analysis of the length of Decker's programs and amount of instruction needed to justify credit, and it may prompt further review by MRFSPD, including the information provided to Decker's accrediting agency on these issues.

Accordingly, the United States maintains that the requested information was relevant in 2005 and further explanation must be provided in any future request by Decker.

**b.    The Trustee must explain how students were able to complete the amount of academic activity necessary to earn large numbers of credits in compressed timeframes.**

In addition to the information requested above, MRFSPD also asked for an explanation as

---

[1] Available at: https://ifap.ed.gov/sfahandbooks/attachments/0405Vol2Ch4ProgramEligibiliy.pdf.

3

to how some students were able to earn a large number of credits in compressed timeframes. Your office previously indicated that a typical student was expected to complete 18 credit hours in 15 weeks. Yet, files in the test review indicate that one student completed 18 credits in only 7 weeks and another student attempted 30 credits over 8 weeks of instruction. It is incredible that a student could attempt this number of credit hours in such a short period of time, especially considering Decker's program timeframes, while maintaining satisfactory academic progress. As a result, MRFSPD requested the Trustee explain "how this amount of work and instruction was successfully accomplished in the compressed timeframe and how Decker verified the student's performance of academic activity at this pace." *See* MRFSPD Letter dated May 19, 2019, p 10.

FSA has consistently evaluated an institution's attendance records to ensure proper administration of Title IV funds. *Hamilton Professional Schools*, Dkt. No. 01-13-EA; 01-14-ST, 2001 WL 34402498 (U.S. Dep't of Edu. Sept. 1, 2001) (FSA reviewed attendance records during on site review and determined that school "overstated" hours of attendance); *Cittone Institute*, No. 94-134-SP, 129 Ed. Law. Rep. 1194, 1996 WL 1056648 (U.S. Dep't of Edu. May 3, 1996); *Maurice Charles Academy of Hair Styling*, Dkt. No. 91-18-ST; 1993 WL 13957174 (U.S. Dep't of Edu. May 17, 1993). As you know, a student's attendance at an institution is critical to the amount of Title IV funds earned by the student. "Accurate student attendance records are essential in the proper administration of the student financial assistance programs." *Maurice Charles Academy of Hair Styling*, 1993 WL 13957174 at *5. A student's attendance at the institution impacts, among other things, the amount of grant funds received by the federal government and whether the institution must refund any money to the Department due to a student's failure to attend the institution. *Id.* As a result, an institution is required to submit accurate and reliable attendance records to the Department.

Accordingly, the United States maintains that the requested information was relevant in 2005 and further explanation must be provided in any future request by Decker.

**c.      The Trustee must provide evidence that any Decker student was on track to successfully complete the Distance Education Program.**

Finally, during the 50-file test review, MRFSPD observed that none of the files indicated that a student attended classes at Decker after the first term. *See* MRFSPD Letter dated May 19, 2019, p 11. As a result, MRFSPD requested clarification as whether any student made progress past their first term.

Despite the Estate's claims, this is not a new request for Decker. In 2005, the Kansas City review team made similar requests in connection with Decker's HCM2 reimbursement requests. *See DN 661*, Exhibit J, Q, and V. In fact, the HCM2 instruction letters provided to Decker in 2005 and 2018 clearly require the institution to provide information about its satisfactory academic progress policy. *See Id.* at Exhibit F; *see also DN 849*, Exhibit A.

The United States also disagrees with the Estate's position that the satisfactory academic policy is not relevant for the test review or any future HCM2 review. Rather, as held in *Eastern*

4

*Technical School*, an institution's failure to evaluate a student's "satisfactory academic progress before distribution of Pell Grant payments" is a serious violation because it goes to "the basic provisions limiting Federal financial assistance to eligible students." *Eastern Technical School*, 69 Ed. Law. Rep. 1288, 1989 WL 297809 (U.S. Dep't of Edu. July 24, 1989).  Not only does the failure provide funds to ineligible students, but it also "reduce[s] the total amount available nationwide for distribution to students properly enrolled in authorized courses and making satisfactory progress." *Id.*

Accordingly, the United States maintains that the information requested in the 50 file test review was relevant in 2005 despite the Estate's claims to the contrary, and therefore further explanation must be provided to the Department or MRFSPD in any future request for by Decker.

Respectfully submitted,

Jessica R. Malloy
Katherine A. Bell
Assistant U.S. Attorneys

5